**STATE of Tennessee, Appellee,**

v.

**James Clark THORNTON,
III, Appellant.**

Supreme Court of Tennessee,
at Jackson.

May 4, 1987.

Leroy Phillips, Chattanooga, John C. Dice, Kelly Start, Memphis, on the brief, for appellant.

W.J. Michael Cody, Atty. Gen., Raymond S. Leathers, Asst. Atty. Gen., Hugh W. Stanton, Jr., Dist. Atty. Gen., James D. Wilson, Veronica F. Coleman, Asst. Dist. Attys. Gen., Memphis, for appellee.

## OPINION

HARBISON, Justice.

Appellant was convicted of murder in the first degree as a result of shooting his wife's paramour in the home of appellant and his wife on May 3, 1983. Appellant found his wife and the victim, Mark McConkey, engaged in sexual relations in the front bedroom of appellant's home. He fired a single shot which struck McConkey in the left hip. The victim died sixteen days later as a result of a massive infection resulting from the bullet wound. Before the night in question appellant had never been acquainted with McConkey or had any previous contact with him.

Appellant and his wife had been married just under four years, and their three-year-old son was in the home in an upstairs bedroom when the shooting occurred in a downstairs bedroom. Appellant and his wife had been separated for about six weeks, but no divorce action had been filed and appellant had been making a serious effort toward reconciliation with his wife.

Under these undisputed facts, in our opinion, the case does not warrant a conviction of homicide greater than that of voluntary manslaughter. The charges accordingly will be reduced to that offense, and the cause will be remanded to the trial court for sentencing and disposition on that basis.

In several previous decisions from this Court and in the almost unanimous course of judicial authority from other states, the encountering by a spouse of the situation which occurred here has been held, as a matter of law, to constitute sufficient provocation to reduce a charge of homicide from one of the degrees of murder to manslaughter absent actual malice, such as a previous grudge, revenge, or the like. Every case, of course, must be decided upon its own facts, but the facts in the present case were entirely undisputed. Appellant's wife testified at the trial and admitted her unfaithfulness to her husband and simply sought to excuse it upon the view that she was separated from him, and that she had told him earlier on the evening of the homicide that she had met someone else and planned to "date" him. In fact she had met McConkey on the evening of Saturday, April 30, 1983, and had had intimate sexual relations with him on that night and on each of the succeeding three nights, includ-

ing the night of May 3 just before appellant burst into the bedroom and found both of them nude and in bed together.

The previous Tennessee cases, in chronological order, are *Toler v. State,* 152 Tenn. 1, 260 S.W. 134 (1924); *Davis v. State,* 161 Tenn. 23, 28 S.W.2d 993 (1930); *Drye v. State,* 181 Tenn. 637, 184 S.W.2d 10 (1944); *Whitsett v. State,* 201 Tenn. 317, 299 S.W.2d 2 (1957). *See generally Temples v. State,* 183 Tenn. 531, 194 S.W.2d 332 (1946); 2 Wharton's Criminal Law § 163 (14th ed., C.E. Torcia, 1979); 40 Am.Jur.2d *Homicide* § 65 (1968); 20 C.J.S. *Homicide* § 49 (1944).

### A. *The Factual Background*

As previously stated, there is almost no dispute as to the material facts in this case. Appellant, James Clark Thornton, III, was thirty-one years of age at the time of the trial of this case in June 1984. His wife, Lavinia, was twenty-seven years of age; they had been married on May 19, 1979, and at the time of the homicide had one child, a son about three years of age. Appellant was a second-year law student at Memphis State University, having previously received his undergraduate degree from the University of Tennessee at Chattanooga. His wife had not completed her undergraduate work when the parties married, but at the time of the homicide she was taking some additional class work toward her undergraduate degree. The victim, Mark McConkey, was twenty-five years of age, single, and a third-year student at the University of Tennessee Medical School in Memphis.

As stated, appellant had never met McConkey and did not even know his name. Mrs. Thornton had met him four days before the homicide and had engaged in sexual relations with him in the home belonging to her and appellant every night since that time, including the night of the homicide. She testified that she thought that when she told her husband that she might want to "date" someone else, that this, in modern society, indicated that she intended to have sexual relations. In that manner she sought to mitigate her infidelity and misconduct toward a husband who had never been unfaithful to her insofar as disclosed by the record.

The marriage of the parties was in some difficulty, apparently as a result of dissatisfaction of Mrs. Thornton. She had advised her husband in March 1983 that she wanted to be separated from him for a time, and he had voluntarily taken an apartment about two miles away from their home. He visited the home almost daily, however, and there has been no suggestion that he was ever guilty of violence, physical misconduct or mistreatment toward his wife or son. He was particularly devoted to the child, and frequently kept the child with him at his apartment on weekends or in the evenings.

Appellant had graduated from a public high school in Chattanooga, after having taken his first three years of high school at a private institution, Baylor. During his junior year at Baylor it was discovered that he had developed a severe case of scoliosis, or curvature of the spine, and he had undergone surgery to correct that condition. He was disabled to the point that he received a vocational rehabilitation grant which enabled him to attend undergraduate school at the University of Tennessee at Chattanooga. He was slightly built, being only five feet six inches in height and weighing about 125 to 130 pounds. McConkey was an athlete, a former basketball and football player in high school. He was five feet nine inches in height and weighed about 183 pounds.

Mrs. Thornton testified that she told McConkey when she first met him that she was married but separated from her husband. She had consulted an attorney and had signed a divorce petition, but the same apparently had not been filed on the date of the homicide.

Appellant, according to uncontradicted testimony, was deeply disturbed over the separation of the parties. He had sought assistance from a marriage counselor, and had persuaded his wife to go with him to the marriage counselor on several occasions. They had a joint meeting scheduled with the counselor on May 4, the day after

the homicide. Appellant testified that the parties had agreed to a separation of six months, and both he and the marriage counselor testified that the parties had agreed that they would not have sexual relations with each other or with anyone else during that period. Mrs. Thornton denied making that agreement, but she did admit meeting with the marriage counselor on several occasions.

Mrs. Thornton was from a very wealthy family and had a generous trust fund which enabled the parties to live on a much more elaborate scale than most graduate students. Appellant, however, had also inherited some property through his family. This had been sold at a profit, and all of his assets had been invested in the home which the parties had purchased in Memphis, together with substantial additions from Mrs. Thornton. It was suggested by the State throughout the trial that appellant was insincere in his concern for the marriage, and that his principal concern was for his financial security.

The record indicates that as early as May 1, two days before the homicide, Mrs. Thornton had stated to her husband that she did not think that the parties would ever be reconciled. On the evening of May 3, appellant picked her and their child up at their home, and the three went to dinner. Again on that occasion Mrs. Thornton reiterated that she thought that the marriage was over, and on this occasion she told appellant that she planned to date someone else whom she had met. Appellant was concerned over the situation, but on a previous occasion his wife had told him that she had had sexual relations with another student, and this had proved to be false.

He returned his wife and child to their home at about 7:30 p.m. and then went to his apartment to study for a final examination in the law school. He called two close friends of the parties, however, and discussed his marital situation with them. Both of them verified that he was very concerned about the situation, but both told him that they believed that his wife was serious about going through with a divorce. One of them advised him that his wife

apparently did not believe his feelings about a reconciliation were sincere.

Acting on that suggestion, appellant returned to the home of the parties in his automobile, stating that he wanted to try once more to convince his wife that he was indeed sincere. When he arrived at the home he saw an automobile parked in the driveway. He did not recognize the car as being one belonging to any of his wife's friends. Accordingly he parked around the corner and walked back to the house. Observing from the rear of the house, he saw his wife and McConkey in the kitchen with the child. He observed as Mrs. Thornton washed some laundry for McConkey and as they were eating dinner. Thereafter they sat and read. They drank wine and smoked some marijuana, and appellant saw them kissing.

He decided to go home to get his camera, but before doing so he let the air out of one of the tires on McConkey's car. He went to his apartment, and obtained his camera and an old pistol which had belonged to his father. He visited a convenience store in an attempt to find film for the camera, and finally obtained some at a drugstore. He then returned to the marital residence, arriving at about 9:30 p.m. He testified that he intended to take pictures for the purpose of showing them to the marriage counselor on the next day and possibly also for use in evidence if divorce proceedings did ensue.

Appellant spent more than an hour in the backyard of his home observing his wife and McConkey in the den and kitchen. Thereafter they left the den area, but appellant remained behind the house, thinking that McConkey was about to leave. When he went around the house, however, he found that McConkey's car was still in the driveway and saw the drapes in the front guest bedroom downstairs had been closed. He listened near the window and heard unmistakable sounds of sexual intercourse. He then burst through the front door and into the bedroom where he found the nude couple and attempted to take some pictures. At that point he testified that he thought McConkey was attempting

to attack him. In all events he drew his pistol and fired a single shot, striking McConkey in the left hip. Appellant did not harm either his wife or child, although Mrs. Thornton said that he did make some threats against her. He went upstairs and brought down the little boy, who had been awakened and who was crying. He assisted in giving directions to enable an ambulance to bring aid to McConkey, and he remained at the house until the police arrived.

Appellant testified that he simply lost control and "exploded" when he found his wife in bed with the victim. He testified that he had armed himself because McConkey was much larger than he, and he felt that he needed protection if there was trouble when he returned to the residence with the camera.

Appellant testified that he did not intend to kill McConkey, but simply to shoot him in order to disable him and also because of his outrage at the situation which he had found. The single shot was not aimed at a vital organ, but the victim ultimately died because of the spread of a massive infection from the wound.

The marriage counselor who had been seeing appellant and his wife examined appellant on a number of occasions after the shooting. When McConkey died sixteen days later, appellant attempted to take his own life. The psychologist, Dr. Hunsacker, testified that appellant was under severe emotional pressure at the time of shooting to the point that he believed appellant had a brief period of temporary insanity and was not legally responsible for his actions. An expert on behalf of the State testified to the contrary with respect to the issue of temporary insanity, but she testified that appellant was undoubtedly under severe emotional stress on the evening in question both before and at the time of the shooting.

Appellant attempted to interpose alternative defenses of self-defense and insanity. The jury rejected both of these defenses,

and we agree with the Court of Criminal Appeals that this was entirely within their province. We further agree with the Court of Criminal Appeals that the State is entitled to the strongest legitimate view of the evidence on appeal. *See State v. Cabbage*, 571 S.W.2d 832 (Tenn.1978).

There are, however, legal principles with respect to the sufficiency of provocation to reduce charges of homicide from murder to manslaughter, and, in our opinion, these principles are controlling here.

### B. *The Legal Issues*

The attorneys who represented appellant at trial and in the Court of Criminal Appeals, as well as in the original application for review in this Court, assigned twelve issues as error. The lead attorney for appellant, however, died after review was granted in this Court, and counsel arguing the case orally conceded that only one real issue was presented in this case; that is, whether the homicide was a degree of murder or voluntary manslaughter. With the issue of insanity, or legal responsibility, having been resolved against appellant, we agree with that assertion. The record does not support a finding of justifiable homicide from self defense, and there was ample testimony from which the jury could reject a defense of insanity or lack of mental capacity.

Nevertheless, as previously stated, it has long been a well-settled legal principle that the commission of unlawful sexual intercourse with a female relative is an act obviously calculated to arouse ungovernable passion, and that the killing of the seducer or adulterer under the influence or in the heat of that passion constitutes voluntary manslaughter, and not murder, in the absence of evidence of actual malice.[1]

One of the leading cases in this jurisdiction is *Toler v. State*, 152 Tenn. 1, 260 S.W. 134 (1924). There the defendant learned during a noon hour that on a previous occasion the victim had seduced his teenage

---

1. "Manslaughter is the unlawful killing of another without malice, either express or implied, which may be either voluntary upon a sudden heat, or involuntary, but in the commission of some unlawful act." T.C.A. § 39–2–221.

daughter and had attempted to molest his nine-year-old daughter. The defendant immediately armed himself, walked a quarter of a mile to a field in which the unarmed victim was working, and shot him several times, killing him instantly.

There, as here, the jury rejected a theory of self-defense. It returned a verdict of murder in the second degree. Reversing and remanding for a new trial, this Court said:

"We are, however, of the opinion that the facts did not warrant a verdict of murder in the second degree. It is undisputed that within less than an hour before he killed the deceased defendant had been informed of the outrage by the deceased of his young daughter. He was convinced of its truth, and, in all probability, it was true. This greatly shocked him and greatly aroused his passion, as it was calculated to do. Defendant, no doubt, from the time he was informed of this assault upon his young daughter until the shooting was done, was greatly agitated and was not capable of cool and deliberate thinking and reasoning, and killed the deceased while in this state of mind; in fact, we think the record fairly shows that this was the state of the defendant's mind at the time he did the shooting. He says that he was greatly shocked and so bothered that he did not know what to do. At any rate his mental stress must have been great, and in view of the fact that less than an hour had elapsed between the time he received information of the assault by deceased upon his daughter and the shooting, there was hardly time for his passion to subside or cool. There could therefore have been neither malice, express or implied, in the killing of deceased under such circumstances." 152 Tenn. at 12, 260 S.W. at 137.

The Court further stated:

"It is not necessary to reduce killing to manslaughter that the passion should be so great as to render the defendant incapable of deliberation or premeditation. If the circumstances be such as are calculated to produce such excitement and passion as would obscure the reason of an ordinary man and induce him, under such excitement and passion, to strike the blow that causes the death of the deceased, this will reduce the killing to manslaughter. *Seals v. State*, 3 Baxt., 459.

"We think the facts of the instant case meet this test, and that defendant was improperly convicted of murder in the second degree." 152 Tenn. at 13, 260 S.W. at 137.

The Court pointed out that if there had been sufficient time for the passion or emotion of the defendant to cool before the shooting, then a verdict of murder might be sustained. It found no such time in that case, nor, in our opinion, was there any such showing in the present case.

An unusual case, in which a conviction for second degree murder was reversed, was *Davis v. State*, 161 Tenn. 23, 28 S.W.2d 993 (1930). There, as found by the jury, the defendant developed an insane delusion, which was wholly false, that there had been improper relations between his wife and the victim. He had seen the two together on the day before he married his second wife in February 1926. She was never able to convince him that there had been no impropriety. Over a year later, on May 6, 1927, the defendant unexpectedly encountered the victim at a service station or garage, shooting him several times and inflicting wounds from which the victim died shortly. Rejecting a defense of irresistible impulse produced by an insane delusion, the Court nevertheless set aside the conviction of murder and ordered the charges reduced to no more than voluntary manslaughter. It said:

"We are of opinion that if as a matter of fact the deceased had debauched the wife of plaintiff in error and the plaintiff in error had been apprised of that fact and had become convinced of its truth on the day of the wedding or thereafter, and, with reasonable expedition while under the influence of passion and agitation produced by such information, had killed Noe, he would only have been guilty of

voluntary manslaughter." 161 Tenn. at 33–34, 28 S.W.2d at 996.

The Court further said:

"It is not necessary that a defendant's reason be dethroned to mitigate a killing to manslaughter. It is error to so instruct a jury ... If the excitement and passion adequately aroused obscures the reason of the defendant, the killing will be reduced to manslaughter ... A defendant acting under such temporary mental stress is presumed to be incapable of malice, an essential ingredient of murder." 161 Tenn. at 35, 28 S.W.2d at 996.

In the case of *Drye v. State*, 181 Tenn. 637, 184 S.W.2d 10 (Tenn.1944), a verdict of murder in the first degree was set aside upon a finding of adequate provocation. There a mentally ill veteran of the First World War had married a woman who was repeatedly unfaithful to him. He had accused her on several occasions, and he had been greatly distressed because of her repeated misconduct. On the day of the homicide his wife called him by telephone from Johnson City and contacted him in Kingsport. She told him over the telephone that she was 21 years of age and would date whomever she pleased. Appellant then caught a bus from Kingsport to Johnson City and there borrowed a pistol. He sought out the place where his wife was staying, and threatened a person there, coercing her into asking his wife to meet him at that person's home. She did so and returned to her own home, where the defendant had remained. He then took a taxicab to the location where his wife was staying and shot her twice.

A defense of not guilty by reason of insanity was rejected, but the verdict of murder in the first degree was set aside upon the ground that the misconduct of the wife afforded sufficient provocation to negate a finding of premeditated deliberation.

Quoting from earlier authorities, the Court said:

"Both of these opinions emphasize, that if the killing is done in passion, the offense is not murder in the first degree; if in passion adequately provoked and acted on before the passion has cooled, it is voluntary manslaughter; and, if in passion in fact, although the provocation be insufficient to reduce the offense to manslaughter, it will nevertheless be murder in the second degree only." 181 Tenn. at 644, 184 S.W.2d at 13.

In *Whitsett v. State*, 201 Tenn. 317, 299 S.W.2d 2 (1957), a verdict of murder in the second degree was reduced by this Court, as a matter of law, to voluntary manslaughter. There the defendant had learned of infidelity by his wife and within an hour he shot to death her paramour after an automobile chase in which he pursued the victim's vehicle for a considerable distance.

The Court said:

"It is properly conceded by the Attorney General, *Toler v. State*, 152 Tenn. 1, 260 S.W. 134, that if the defendant had not had any suspicions or information as to his wife's infidelity prior to the morning of the conversation with young Mills, and had then killed McPhearson within the time in which he did kill him after receiving that information, the unlawful homicide would not have arisen to a degree higher than that of voluntary manslaughter." 201 Tenn. at 325, 299 S.W.2d at 6.

It was insisted by the State that the defendant had known for some time of the misconduct between his wife and McPhearson, and that therefore there had been ample time for the cooling of passion. It appeared, however, that the defendant had received additional information on the morning of the homicide.

The Court said:

"No repetition of the facts established by this record need be had in support of the necessary conclusion that at the moment defendant pursued and killed McPhearson he was laboring under an adequately aroused passion so great as to obscure his reason. Under these circumstances 'the killing will be reduced to manslaughter,' *Davis v. State*, 161 Tenn. 23, 35, 28 S.W.2d 993, 996, provided the passion has not had time to cool.

"The intense and adequately provoked passion under which he was laboring at this moment was produced by the additional information just furnished him by Mills. There is no other explanation for it in the light of his previous conduct for eight months prior to receiving this information, and strongly supports his testimony that when he unexpectedly saw McPhearson just before he killed him 'all of this stuff this boy told me that morning came back to me and him riding around with his wife and both of them looked happy and my home tore all to pieces, I don't know what happened, I lost control of myself....'" 201 Tenn. at 326–327, 299 S.W.2d at 6–7.[2]

The facts of the present case are far stronger than any of the foregoing. Appellant actually discovered his wife *in flagrante delicto* with a man who was a total stranger to him, and at a time when appellant was trying to save his marriage and was deeply concerned about both his wife and his young child. He did not fire a shot or in any way harm the victim until he actually discovered the victim and his wife engaged in sexual intercourse in appellant's own home. In our opinion the passions of any reasonable person would have been inflamed and intensely aroused by this sort of discovery, given the factual background of this case. Even though he was not legally insane so as to relieve him of all criminal responsibility for the tragic death which occurred, in our opinion this was a classic case of voluntary manslaughter and no more.

We are of the opinion that the necessary elements of malice and premeditation were not demonstrated in this case and that the appellant acted under legally sufficient provocation. The conviction of murder in the first degree is set aside, and the cause will be remanded to the trial court for sentencing of the defendant for voluntary manslaughter and for such other disposi-tion as may be appropriate in view of the time already served by the appellant. Costs of the appeal are taxed to the State. All other costs will be fixed by the trial court.

BROCK, C.J., FONES, J., and GREER, Special Justice, concur.

DROWOTA, J., files separate Opinion, concurring in part and dissenting in part.

DROWOTA, Justice, concurring in part and dissenting in part.

While I concur with the result of the majority opinion insofar as the evidence in this case will not sustain the jury's finding that Defendant, James C. Thornton, III, is guilty of murder in the first degree, I must respectfully dissent from the holding of the majority that the conviction should be reduced to voluntary manslaughter. Because the evidence clearly establishes that Defendant acted with sufficient malice, the killing constitutes murder in the second degree.

In this case, the facts demonstrate that the events on the evening of May 3, 1983, took place over about a four hour period between approximately 7:30 and 11:30 p.m. Without reciting the evidence extensively, I summarize the evidence here to emphasize the sequence and timing of the events and Defendant's state of mind during this period. After returning to the marital home following dinner with his estranged wife and son, Defendant went to his apartment several miles away, arriving there sometime close to 7:30 p.m. He was tense, distraught, and depressed and decided to make telephone calls to mutual friends of his and his wife to discuss his problems. These telephone conversations continued until about 8:30 p.m. In his desperation, Defendant returned to the marital home to talk to his wife again and upon arriving discovered an unfamiliar car parked in the

---

2. In addition to the foregoing authorities, *see also Temples v. State*, 183 Tenn. 531, 194 S.W.2d 332 (1946), in which the defendant was found guilty of voluntary manslaughter when he killed his wife's paramour. He insisted on appeal that he was entitled to an acquittal by reason of insanity. The Court held there was sufficient evidence to sustain the verdict of the jury on mental capacity. The Court cited and reviewed the cases previously discussed in this opinion and approved a verdict of voluntary manslaughter.

driveway. Aware that his wife might be dating someone, Defendant parked some distance away and stealthily made his way to the rear of the house to see who was visiting his wife. Defendant's wife testified that the victim, Mark A. McConkey, had arrived at the house close to 8:30 p.m., her date with him having been pre-arranged earlier that same day. Defendant saw his son playing in the den while his wife and the victim, whom he did not recognize, were kissing and embracing. He described his emotional state as one of shock and a sickening fear. He was upset at seeing his wife being embraced by another man in front of his child. Not unreasoning, however, in view of a pending divorce, Defendant determined to return to his apartment to get his camera to take photographs of his wife's adulterous rendezvous. Before departing, Defendant deflated the left rear tire of the victim's car.

At about 9:00 p.m., according to the wife's testimony, their son was put to bed in the master bedroom on the second floor of the house. She testified that for about two hours after putting her son to bed, she and Mr. McConkey ate, read, and did laundry in the kitchen and den area on the first floor of the house. Evidently, Defendant left before his son was put to bed. At his apartment, Defendant changed clothes, obtained his camera, which had flash and telescopic lens attachments, and his loaded .45 caliber service automatic pistol. Having no film for the camera, Defendant was required to stop at two places before finding film, purchasing some at a Walgreen's Drugstore at about 9:30 p.m. He loaded the camera and drove back to his wife's neighborhood, parked around the corner from the house, and again walked to the marital home. The first photograph he took was of the license plate on the rear of the victim's car. Defendant then went behind the house to look into the windows of the kitchen and den. His wife and Mr. McConkey were in the den reading. Defendant watched this scene for some time, feeling despondent. Eventually, he saw his wife go to Mr. McConkey and lie down on top of him on the couch; they became affectionate, kissing and talking. At this point he started taking a series of twelve to fifteen photographs. Anger started welling up in him, yet he did nothing more than make photographs. They got up to complete Mr. McConkey's laundry. After folding the laundry, Defendant's wife and Mr. McConkey turned off the lights in the kitchen and den and carried the laundry to the front of the house. Believing or hoping that the victim would then be leaving, Defendant waited at the rear of the house for a short time and then walked around to the front; he saw Mr. McConkey's car still parked in the driveway. Noticing that the curtains to the guest bedroom were drawn, Defendant feared that his wife and the victim had retired to this bedroom. He drew closer to the window to listen and heard the sounds of two persons engaged in sexual relations. Defendant testified that his head started to swim and that he felt sickened.

Suddenly, at approximately 11:15 p.m., Defendant, a small man, kicked through the locked front doors of the house and went directly to the guest room. The room was dark but the door was open. His camera ready to take photographs, Defendant switched the lights on; the first thing he saw was his nude wife. Mr. McConkey, nude but covered with a sheet, was on the side of the bed nearest to the door. Defendant's first reaction was to attempt to take photographs but he could not focus the camera. He then reached down and jerked the sheet off of Mr. McConkey. Again he attempted to take a photograph but without success. While trying to work the camera, thinking that he saw the victim's hands reaching towards him in his peripheral vision, Defendant drew the loaded pistol from his coat pocket. Defendant testified that at this moment he lost control and began screaming, the pistol in his hand, saying to Mr. McConkey: "I ought to teach you screwing around with somebody else's wife. I ought to shoot you in the ass." He further testified that he intentionally pointed the muzzle of the pistol at the victim's lower body. He didn't remember cocking the single action pistol but the pistol discharged, the bullet striking Mr.

McConkey in the left rear hip, passing completely through the abdomen to lodge in a wall. Defendant also testified that when he pulled the pistol, Mr. McConkey had retreated and turned away from him, exposing his left rear side to him. After being shot, the victim pulled himself off of the bed and tried to push the bed between himself and Defendant, who again was trying to take a photograph. When he realized that Mr. McConkey was injured, Defendant regained sufficient control of himself to disarm the weapon. He subsequently gave instructions on the telephone to assist an ambulance in locating the address. At about 11:41 p.m., the first police officers arrived on the scene. Asked what had happened, Defendant stated: "He was in bed with my wife and I shot him. I don't know what came over me." Defendant was then arrested.

None of the evidence in this case is sufficient to sustain a verdict of first degree murder. As this Court observed in *State v. Bullington*, 532 S.W.2d 556, 559–560 (Tenn.1976):

"The premeditation-deliberation element of first degree murder requires that the act be performed with a cool purpose.... In order to constitute murder in the first degree, the cool purpose must be formed and the deliberate intention conceived in the mind of the accused, in the absence of passion, to take the life of the person slain.... If the purpose to kill is first formed during the heat of passion, the accused, to be guilty of first degree murder, must have committed the act after the passion has subsided. 'Passion' as here used means any of the human emotions known as anger, rage, sudden resentment or terror which renders the mind incapable of cool reflection." (Citations omitted.)

I think that Defendant did not act after a cooling off period and thus a conviction of first degree murder cannot be supported on these facts. *See also Clarke v. State*, 218 Tenn. 259, 267–268, 402 S.W.2d 863, 867–868, *cert. denied* 385 U.S. 942, 87 S.Ct. 303, 17 L.Ed.2d 222 (1966). Although the State argues with force and logic that these facts demonstrate premeditation and sustain the jury's verdict, as this Court observed in *Drye v. State*, 181 Tenn. 637, 646, 184 S.W.2d 10, 13 (1944):

"That [defendant's] actions in procuring the weapon and seeking contact with his wife appeared deliberate and determined, is not persuasive that his passion had cooled. Suppressed anger is a common accompaniment of passion, the deepest and most powerful emotion, and of a determination beyond control to carry through a design formed in passion. Nor is the fact that he was relatively calm after the event inconsistent. Having discharged the weapon, his mind recoiled into calm...."

The law is well established that the presence and amount of passion will affect the degree of a homicide; however, "[i]n order to reduce second degree murder to voluntary manslaughter, it must be shown that the defendant acted upon a sudden heat of passion, *without malice*." *State v. Estes*, 655 S.W.2d 179, 183 (Tenn.Cr.App.), *perm. to app. denied* (Tenn.1983) (citation omitted; emphasis in original). *See also State v. Morgan*, 541 S.W.2d 385, 390 (Tenn. 1976). Malice is evident on the facts of this case and "is an essential element of both murder in the first degree and murder in the second degree." *State v. Martin*, 702 S.W.2d 560, 563 (Tenn.1985).

"Malice is not necessarily confined to an intention to take the life of the deceased, but includes an intention to do any unlawful act which may probably result in depriving the party of life. It is not so much spite or malevolence to the individual in particular as an evil design in general, the dictates of a wicked and depraved and malignant heart."

*Bailey v. State*, 479 S.W.2d 829, 834 (Tenn. Cr.App.1972).

Aside from the use of a firearm, which in itself permits an inference of malice, *State v. Martin, supra*, at 563, Defendant threatened the victim immediately before the weapon discharged, striking the victim precisely where Defendant threatened to shoot. Defendant intentionally aimed the weapon at the victim to avoid a fatal wound, but this inadequate precaution was

insufficient to prevent the foreseeable consequence of death from a serious wound at close range with a large caliber weapon. *Cf. State v. Taylor,* 668 S.W.2d 681, 683 (Tenn.Cr.App.), *perm. to app. denied* (Tenn.1984) (Defendant failed to lower the weapon sufficiently to prevent a mortal wound). In *Ferguson v. State,* 528 S.W.2d 64, 65 (Tenn.Cr.App.), *cert. denied* (Tenn. 1975), the use of a firearm coupled with threatening statements supported the finding of malice to sustain a conviction for second degree murder. Other evidence of malice exists in this record as well,[1] but these two facts are sufficient to negate the majority's conclusions that no malice exists and that Defendant is guilty of voluntary manslaughter.

Furthermore, assuming that Defendant was provoked to act when he heard the sounds of sexual relations emanating from the guest room and was provoked to such an extent that he was able to break through the locked front doors, he did not fire immediately upon entering the bedroom but instead attempted to take photographs and then threatened the victim before the gun discharged. These actions preceding the shooting do not indicate that Defendant's reason had been so overcome by passion and excitement to make him incapable of malice. *See Davis v. State,* 161 Tenn. 23, 35, 28 S.W.2d 993, 996 (1930). For a killing to be considered voluntary manslaughter, absence of malice as well as sufficient provocation are among the required elements of the offense. Any killing that is not first degree murder but cannot constitute a lesser offense of manslaughter is second degree murder. *See* T.C.A. § 39–2–211. Defendant acted in passion and without any previously formed design to kill, but he didn't act without malice at the time of the shooting. The reasoning of the Court in *Drye v. State, supra,* is applicable here:

> "[I]f the killing is done in passion, the offense is not murder in the first degree; if in passion adequately provoked and acted on before the passion has cooled, it

is voluntary manslaughter; and, if in passion in fact, although the provocation be insufficient to reduce the offense to manslaughter, it will nevertheless be murder in the second degree only."

181 Tenn. at 644, 184 S.W.2d at 13.

Similarly, as in this case, if a killing is provoked but committed *with malice,* it will constitute second degree murder because not every element of voluntary manslaughter is shown but every element of second degree murder is shown on the facts. Consequently, I would reduce the conviction to second degree murder.

---

1. For instance, Mr. McConkey asked Defendant not to shoot; he was retreating at the time the Defendant's weapon discharged and was shot from the rear. That Defendant deflated one of Mr. McConkey's tires may also be some evidence of malice.