# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
# AT JACKSON
April 10, 2007 Session

## STATE OF TENNESSEE v. CLAUDELL WATKINS CARPENTER

**Direct Appeal from the Circuit Court for Weakley County**
**No. CR116-2004     William B. Acree, Jr., Judge**

---

### No. W2006-01399-CCA-R3-CD  - Filed March 28, 2008

---

Following a jury trial, the defendant, Claudell Watkins Carpenter, was convicted of second degree murder, first degree murder in the perpetration of a burglary, especially aggravated burglary, and aggravated assault.  Additionally, the defendant pled guilty to evading arrest.  Pursuant to Tennessee Rule of Criminal Procedure 29, he filed a motion for judgment of acquittal, which the trial court subsequently granted as to certain of the convictions, reducing the second degree murder conviction to voluntary manslaughter and dismissing the first degree murder and aggravated assault convictions. The defendant then was sentenced as a Range I, standard offender to six years for the voluntary manslaughter conviction, twelve years for the especially aggravated burglary conviction, and eleven months, twenty-nine days for the evading arrest conviction, with all sentences to be served concurrently.  Thereafter, the State appealed the trial court's ruling on the motion for judgment of acquittal.  Rule 29, pursuant to which the defendant filed the motion for judgment of acquittal, requires that, before a judgment is entered following the granting of a motion for judgment of acquittal, the court first should rule on the motion for new trial.  Accordingly, we remand this matter to the trial court for disposition of the motion for new trial so that a single appeal will result from the defendant's trial.  Since judgments were entered prematurely following the court's granting the motion, they are set aside, and the jury verdicts for second degree murder (Count 1), first degree murder in the perpetration of a burglary (Count 2), and aggravated assault (Count 4) are reinstated. Because the State's appeal is premature, it is dismissed.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Reversed and**
**Appeal Dismissed**

ALAN E. GLENN, J., delivered the opinion of the court, in which DAVID G. HAYES and JOHN EVERETT WILLIAMS, JJ., joined.

Robert E. Cooper, Jr., Attorney General and Reporter; Rachel E. Willis, Assistant Attorney General; Thomas A. Thomas, District Attorney General; and Kevin McAlpin, Assistant District Attorney General, for the appellant, State of Tennessee.

Joseph P. Atnip, District Public Defender, for the appellee, Claudell Watkins Carpenter.

# OPINION

## FACTS

In brief, the facts of this case are that the defendant, an officer of the Weakley County Sheriff's Department, suspected that his estranged wife was having an affair. He went to the apartment where she was living with their two daughters, burst through the front door, fracturing it, went to a bedroom, where his estranged wife and the victim were located and shot the victim fifteen times, eight of which were in the back. He was arrested at the scene. Although it is undisputed that the defendant's wife and the victim were not having sexual relations when the defendant entered the apartment, they only were partially clothed, according to defense proof, which was contested by the State. We will set out the evidence in this matter, although our determinations are based upon the procedure by which the appeal reached this court, rather than trial testimony.

### State's Proof

Renee Carpenter[1] testified that she and the defendant were married in 1997 and had two daughters. In February 2004, they separated because of marital problems, and in June, Renee and their daughters moved to the Oakwood Apartments in Greenfield.

On June 15, 2004, Renee took the defendant to a counseling session and, that evening, he telephoned her at about 9:30 p.m. at her apartment to say goodnight. Approximately an hour later, the victim, Joe Martin, with whom Renee had begun an affair after she and the defendant separated, came to her apartment. The defendant previously had asked her about telephone calls she had received from the victim, and she denied that they were having an affair, saying the victim was calling to sell drugs to her brother. While the victim was at Renee's apartment, a man whom she did not know, knocked on her door, "looked" at her as she opened it, and then turned and walked away. Renee called to Officer Kevin Klutts, whom she saw in the parking lot, and informed him of the incident. Shortly thereafter, Officer Klutts came to Renee's apartment, and the victim went to her daughters' bedroom[2] while she discussed the incident with Klutts. After Klutts left, Renee went to the bedroom and told the victim about her conversation with Klutts. As they were talking, she heard a "loud thump" and got up to investigate. As she reached the bedroom door, Renee saw the defendant, who pushed her out of the way, and then began shooting the victim, who still was sitting on one of the beds. She asked the defendant what he was doing, and he replied, "I don't know. I think I just fucked up."

---

[1] Because Renee Carpenter and the defendant share the same last name, we will refer to her as " Renee." We intend no disrespect by this reference, but do so to avoid using her entire name in each reference to distinguish her from the defendant.

[2] Renee testified that her daughters were sleeping in her bedroom that night instead of their room.

Officer Kevin Klutts testified that on June 15, 2004, he was dispatched to the Oakwood Apartments at about 11:00 p.m. and spoke with a resident, Tiffany Cash, who said that an unknown male was knocking on apartment doors. Officer Klutts located the man, Brian Seiber, and went to Renee's apartment to take her complaint against Seiber. When he returned to the parking lot, Klutts saw a sheriff's department car pull into the parking lot, stop near a green Impala, and then pull into a parking space. When the driver got out of the vehicle, Officer Klutts recognized that it was the defendant, who was wearing blue jeans and a dark-colored t-shirt. The defendant first tried to open the door of Renee's car and then went upstairs to her apartment. Shortly afterwards, Klutts heard "a series of loud bangs," that sounded as if someone were beating on a door. Hearing a woman scream, he ran up the stairs, and saw that the frame of the door to Renee's apartment was "fractured like someone had busted the door in." The defendant, with a pistol in his right hand, exited the apartment, laid his gun down on the stairwell, held his hands away from it, saying, "I'm done." Officer Klutts handcuffed the defendant, and Renee came out of the apartment screaming, "What have you done?" Officer Klutts placed the defendant in his patrol car, escorted Renee to the apartment of Tiffany Cash, and then returned to Renee's apartment. In the bedroom, he found the victim, who was wearing blue jean shorts and a shirt, lying on the floor between the beds. After Brad Hardin, a first responder, and other officers arrived on the scene, Officer Klutts returned to his vehicle and discovered the right rear window broken out and the defendant gone. Klutts said that he collected the defendant's gun as evidence and denied that he unzipped or unbuttoned the victim's shorts.

Greenfield Police Lieutenant Danny Smith testified that he was called to the scene, where he spoke with Officer Klutts. He checked the victim's identification and determined that he was Joe Martin. He saw that the victim's shorts were unzipped but pulled up. He retrieved the defendant's weapon from Officer Klutts and ejected the magazine. Two bullets remained in the weapon, one in the magazine and one in the chamber. Lieutenant Smith said that the weapon could fire thirteen to fourteen shots without reloading.

Tennessee Bureau of Investigation Special Agent Valerie Troutt testified that she was called to the scene and observed that the victim had several gunshot wounds. She identified a photograph she made at the scene which showed the victim with his shorts unbuttoned and unzipped and his shirt cut off. Agent Troutt said that she took possession of the defendant's weapon, a Glock Model 35, .40 caliber semi-automatic pistol with a fifteen-round capacity magazine, and took a statement from Renee. After the defendant was taken into custody several hours later, she interviewed him. The defendant told her that he had heard his wife was having an affair with the victim, but each had denied it to him. On the evening of June 15, several hours after speaking on the phone with his wife, the defendant drove to her apartment and saw the victim's car in the parking lot. He called the dispatcher and confirmed with the tag number that it was the victim's vehicle. He then went to Renee's apartment, and, in his words, "push[ed] in the door." He found Renee and the victim in bed together, but they were "not going at it." He said that the victim jumped up, causing him to believe that the victim was "coming after" him. The defendant said that he did not remember shooting the victim.

-3-

Dr. Feng Li testified that he performed an autopsy on the victim, concluding that the cause of death was multiple gunshot wounds. He said that the victim had fifteen separate wounds, eight of which had entered his back. He said that some of the wounds were consistent with the victim and the defendant both standing upright, while some were consistent with the victim sitting upright in bed and the defendant standing over him.

The parties stipulated that the gunshot residue on the victim's shirt showed that at least one of the shots was fired within four feet of him.

Alisa Fuller testified that she saw the defendant at the Weakley County Sheriff's Department on April 16, 2004, when she was charged with DUI. The defendant gave her a card with his home phone number and called her several times. On two occasions, he told her that he thought his wife was cheating on him and that he would kill the person he caught her with. Fuller said the defendant called her from jail after his arrest, saying that he "would plead insanity because of his medication . . . and the problems that he'd had in the past." The defendant told her that he did not remember the shooting but that he knew his wife was cheating on him.

**Defense Proof**

First Responder Brad Hardin and Deputy Candace Floyd testified that they were the next to arrive on the scene after Officer Klutts. Both said that the victim's pants were unbuttoned and unzipped when they arrived, and Hardin acknowledged that he either tore or cut the victim's shirt in an effort to treat his wounds.

Billy Smith testified that he was a close friend of the defendant's, but they had a "falling out" because the defendant wanted to carry his badge and gun when they went out. Weakley County Sheriff's Deputies Keith Hazelwood, Mark Black, Randy Crocker, and Danny Browning testified that the defendant was a good officer and that it was not unusual for officers to carry their badges and weapons while off duty.

The defendant testified that, following his discharge from the Army, he joined the Weakley County Sheriff's Department in April 2001. He had twice been called back to active duty, and he and Renee separated following his second deployment. The defendant said that he was taking Paxil, an antidepressant, at the time of the shooting. He denied that he had a physical relationship with Alisa Fuller but admitted that he had been unfaithful to his wife in the past. He had suspected that his wife was having an affair but did not know with whom. On the evening of June 15, fearing that something was wrong because Renee did not answer the telephone, he drove from his home in Gleason to her apartment in Greenfield. There, he saw a car, which he believed belonged to the victim, and called the dispatcher to make certain. Because Renee had told him that the victim was a drug dealer, he then went to her apartment either to make the victim leave or to get his daughters out. He hit the door with his shoulder to open it and went to the bedroom, where he saw his wife's "nude behind" and the victim "stuffing his penis back in his pants." The victim stood up, and the defendant pulled his weapon but did not remember firing it. The defendant denied that he had gone

to the apartment to assault or shoot the victim and said that, previously, they had parted on good terms.

On cross-examination, the defendant acknowledged that he did not tell Agent Troutt or Dr. Moragne, who evaluated him, that he was concerned about the victim's selling marijuana. He also acknowledged that he did not tell Agent Troutt or Dr. Moragne that he saw his wife's "nude behind" or the victim's "stuffing his penis back in his pants." He explained that it was later when he remember those occurrences.

## ANALYSIS

As we will explain, we have concluded that this matter must be remanded to the trial court so that the procedures of Tennessee Rule of Criminal Procedure 29 be followed, that is, the motion for new trial be disposed of before entry of the judgments following the court's granting of the motion for judgment of acquittal.

The version of Rule 29 of the Tennessee Rules of Criminal Procedure in effect at the time of the defendant's trial and the court's ruling on his motion for a judgment of acquittal required that a trial court first dispose of a motion for new trial before entering a judgment resulting from the granting of a motion for judgment of acquittal:

> If the jury returns a verdict of guilty or is discharged without having returned a verdict, a motion for judgment of acquittal may be made or renewed within 30 days of the date the order of sentence is entered or within such further time as the court may fix during the 30-day period. . . . If a verdict of guilty is returned the court may on such motion, set aside the verdict and after disposing of a motion for a new trial enter judgment of acquittal. The [S]tate shall have the right of appeal where the court sets aside a verdict of guilty and enters a judgment of acquittal.

Tenn. R. Crim. P. 29(c) (2005).

The trial court's written order on the defendant's motion for judgment of acquittal is as follows:

> This case is before the Court upon the defendant's motion for a judgment of acquittal.
>
> The defendant was indicted for premeditated murder, felony murder, especially aggravated burglary, and aggravated assault. This case was tried to a jury, and the jury found the defendant guilty as indicted except for the premeditated murder count. As to that count, the jury found the defendant guilty of the lesser included offense of second degree murder.

-5-

In the defendant's motion for judgment of acquittal, he seeks a reduction of the second degree murder conviction to voluntary manslaughter and a dismissal of the felony murder conviction.

On June 15, 2004, the defendant shot and killed Joe Martin. The defendant broke the door of the apartment of his estranged wife, found Martin and his wife partially undressed and shot him numerous times.

The defendant and his wife, Susan Renee Carpenter, married in 1997. They had two daughters who were 9 and 7 years of age at the time of the trial. The defendant was a deputy in the Weakley County Sheriff's [D]epartment and was a member of the [N]ational [G]uard. He had been called to active duty on two occasions.

The defendant and his wife separated in February of 2004. During the separation, the defendant provided financial support to his wife and daughters. On June 11, 2004, the defendant's wife and his two daughters moved into an apartment in Greenfield, Tennessee. The defendant helped them move into the apartment.

The defendant's wife testified that she was trying to end the marriage. However, she attended three counseling sessions with the defendant[,] the last of 8which was on the day of the shooting. In the week preceding the shooting, she made approximately 50 telephone calls to the defendant. One call was for 21 minutes and another was for 20 minutes.

The defendant's wife began a sexual relationship with Joe Martin after she left the defendant. When questioned by the TBI after the homicide, she denied the relationship because she was afraid the truth might assist the defendant in his defense. About two months later, she told the agent she had a sexual relationship with Martin.

According to the defendant's wife, Joe Martin was a drug dealer. She told the defendant of Martin's involvement with drugs before the homicide and told a TBI agent of this afterwards.

On the night of June 15, 2004, the defendant talked with his wife by telephone. After sleeping for a period of time, the defendant woke up and attempted to telephone his wife. He could not reach her. According to the defendant, he left for his wife's apartment to check on her and his daughters.

Before leaving his home, the defendant put on his badge and gun. Several deputies in the sheriff's department testified that it was not unusual for a police

officer to carry his gun and badge while off duty and that this was permissible under the sheriff's department's policy.

After arriving at the apartment complex, the defendant observed a vehicle near his wife's apartment. He radioed the sheriff's department and learned that this was Martin's vehicle. The defendant testified that he was going to make Martin leave or he was going to take his children from the apartment.

After arriving at the apartment, he hit the apartment door with his shoulder, broke it open, and entered the apartment. He noticed lights on in a bedroom and went into it. The defendant testified he saw his wife's nude behind and saw Joe Martin stuffing his penis into his pants. The defendant's wife denied that she was partially unclothed or that Martin had taken his penis out of his pants. However, four police officers who went to the scene testified that Martin's pants were unbuttoned and unzipped, and the testimony of the defendant's wife was not credible considering her denial of her relationship with Martin. Upon entering the bedroom, the defendant drew a gun and shot and killed Joe Martin. According to the testimony of the medical examiner, there were 15 gunshot wounds[,] eight of which were to the back.[3]

After shooting Martin, the defendant left the apartment and met an officer of the Greenfield [P]olice [D]epartment who was at the apartments to investigate a separate complaint. The defendant laid down his weapon and was handcuffed by the officer. The officer put the defendant into the police car and went to the scene of the homicide. Later, he found that the defendant had broken the window of the police car and had escaped. The defendant was apprehended the next day.

During the trial, the defendant timely moved for a judgment of [] acquittal and timely renewed that motion after the verdict was returned.

A judgment of acquittal must be entered if the evidence is insufficient to sustain a conviction of the offense for which the defendant is charged.

The defendant first argues that the evidence was insufficient so sustain a conviction for second degree murder and that the Court should set aside the jury verdict and find the defendant guilty of voluntary manslaughter. Second degree murder is a knowing killing of another whereas voluntary manslaughter is the intentional or knowing killing of another in a state of passion produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner (see T.C.A. § 39-13-201 and T.C.A. § 39-13-211).

---

[3]The defendants' daughters were in a separate bedroom at the time of the shooting and did not witness the incident.

The defendant contends that he had no intention of killing Joe Martin and did so only after finding Martin and his wife in a compromising situation. The defendant relies upon the case of State v. Thornton, 730 S.W.2d 309 (1987). In Thornton, the defendant saw his estranged wife kissing another man. He left, got his gun, and returned to his wife's home. He watched them from her backyard for about an hour and observed them kissing again. The defendant kicked through the locked front door of the house, entered and found his wife and the victim nude. He took pictures of them and then shot the victim. The jury found the defendant guilty of first degree murder.

The Supreme Court of Tennessee set aside the conviction of murder in the first degree and remanded the case to the trial court for sentencing of the defendant for voluntary manslaughter. The Supreme Court said in part:

> "It has long been a well-settled legal principal that the commission of unlawful sexual intercourse with a female relative is an act obviously calculated to arouse ungovernable passion, and that the killing of the seducer or adulterer under the circumstance or in the heat of passion constitutes voluntary manslaughter, and not murder, in the absence of evidence of actual malice."

This Court has carefully reviewed the evidence in this case and finds no evidence of actual malice. Although separated from his wife, the defendant was in constant contact with her and their children. After awakening and being unable to reach her, he went to her apartment and found Joe Martin to be in the apartment. After finding them in a[] semi-nude condition, he shot Martin 15 times.

The Court finds as a matter of law that there was no evidence of malice and that the evidence is insufficient to sustain a conviction for second degree murder. The Court finds as a matter of law that the killing was in a state of passion produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner, and, accordingly, enters a verdict of voluntary manslaughter as to the first count.

The defendant next argues that the evidence was insufficient to sustain a conviction for felony murder and that the Court should set aside the jury verdict and dismiss this count. The defendant argues that the State has failed to prove the requisite mens rea, and, therefore, the defendant is not guilty of the felony murder charge.

Felony murder is a killing of another committed in the perpetration of or attempt to perpetrate certain crimes including the crime of burglary. No culpable mental state is required for conviction except the intent to commit the enumerated

-8-

offense. (T.C.A. § 39-13-202)  As pled by the State in this case,[4] the defendant committed a burglary by entering the building without the effective consent of the property owner and by assaulting Joe Martin.  (T.C.A. § 39-14-402)  A person commits an assault who intentionally, knowingly or recklessly causes bodily injury to another (T.C.A. § 39-13-101), and as pled by the State, the assault occurred when the defendant shot and killed Joe Martin.

The mens rea required for a felony murder conviction is summarized in two recent Tennessee Supreme Court cases.  The Court, in State v. Buggs, 995 S.W.2d 102 (Tenn. 1992), citing State v. Kimbrough, 924 S.W.2d 888 (Tenn. 1996) stated:

> "The prevailing view is that in order for the felony-murder doctrine to be invoked, the actor must intend to commit the underlying felony at the time the killing occurs; there is no felony-murder where the felony occurs as an afterthought following the killing. . .
>
> In the typical case of felony murder, there is no malice in "fact" with respect to the homicide; the malice is supplied by the "law". There is an intended felony and an unintended homicide. The malice which plays a part in the commission of the felony is transferred by the law to the homicide.  As a result of the fictional transfer, the homicide is deemed committed with malice. Id. at 296.
>
> If an accused had no intent to commit the underlying felony at the time of the killing, the basis for the felony-murder rule does not apply."

The evidence in this case does not support a finding that the defendant entered the apartment with the intent to commit an assault, or after entering, he intentionally assaulted Joe Martin.  The assault relied upon by the State for the felony murder count is the infliction of 15 gunshot wounds which caused Martin's death. That is, the assault and the homicide are the same act.  In count one, the jury found the defendant not guilty of premeditated murder and thus found that he did not intentionally kill Joe Martin.  To find the defendant guilty of felony murder would mean that the defendant intentionally assaulted Joe Martin, but he unintentionally killed him.  Such a result is not possible.  The explanation for the inconsistency is that the jury was charged that it could find the defendant guilty of assault by reckless conduct.  This charge was in error.  The Court concludes the evidence is insufficient

---

[4]According to the State's attorney, count two must be read in conjunction with count three to determine the elements of burglary relied upon by the State.

to establish the defendant intentionally committed the felony of burglary and is insufficient to support a verdict of felony murder.

Notwithstanding the foregoing, there is another reason the felony murder conviction must be dismissed. As the felony murder count was pled by the State, the State was only required to prove: (1) that the defendant unlawfully and feloniously killed Joe Martin; and (2) he did so after entering a building and committing an assault; and (3) the assault was committed by intentionally, knowingly or recklessly causing bodily injury.

The problem is that the felony murder count as pled by the State can be committed by reckless means. According to the statute and the case law, a felony murder cannot be committed in the absence of intentional conduct. That is, it is necessary that the defendant have the intent to commit the underlying felony. A felony committed by reckless conduct cannot be the basis for a felony murder conviction under Tennessee law.

Because of the manner in which the felony murder count was pled, the verdict must be set aside.

There is one other issue which was not raised in the defendant's motion for judgment of acquittal. The defendant was found guilty of aggravated assault of Joe Martin (count four). The aggravated assault charge arises from the same act as the homicide. The defendant cannot be convicted of both. Therefore, the court, sua sponte, dismisses the aggravated assault count.

In summary, a judgment of conviction will be entered as to count one for the crime of voluntary manslaughter, and counts two and four are dismissed.

A sentencing hearing has previously been scheduled for June 29, 2006, and the defendant will be sentenced for the crimes of voluntary manslaughter and especially aggravated burglary.

IT IS SO ORDERED.

The record in this matter shows that the defendant was found guilty on November 2, 2005, of the various offenses, that he filed a motion for judgment of acquittal on November 10, 2005, and a motion for new trial on December 1, 2005. The lengthy and detailed order granting the motion for judgment of acquittal was entered on May 25, 2006. The judgments in this matter were signed by the trial court on June 29, 2006. The State filed a notice of appeal that same day, contesting the relief granted pursuant to the motion for judgment of acquittal. The motion for new trial was, and presumably still is, pending. For that reason, as we will explain, this matter must be remanded to the trial court.

-10-

As we have set out, Tennessee Rule of Criminal Procedure 29(c) provides that "[i]f a verdict of guilty is returned the court may on such motion, set aside the verdict and after disposing of a motion for a new trial enter judgment of acquittal." The purpose of first "disposing of a motion for new trial" is obvious.[5] In the event this court's ruling on the judgment of acquittal is adverse to the defendant, the trial court could properly, upon remand, rule upon the pending motion and grant a new trial, finding the verdict is against the weight of the evidence. See Tenn. R. Crim. P. 33(d). Thus, rather than have the judgment of acquittal and the grant of a new trial be reviewed by two different panels of this court, resulting in protracted delay, Tennessee Rule of Criminal Procedure 29(d)(2) requires the trial court to enter a ruling on the motion for new trial so that the two rulings can be reviewed in a single consolidated appeal.[6]

Accordingly, we remand to the trial court for disposition of the pending motion for new trial as directed by Rule 29(d)(2).

We note that, in our review of the motion for judgment of acquittal, the trial court appears to have made determinations, in part based upon its view of the weight of the evidence. However, in considering such a motion, a court is to consider the "legal sufficiency of the evidence and not . . . the weight of the evidence." State v. Thompson, 88 S.W.3d 611, 615 (Tenn. Crim. App. 2000). Thus, in considering such a motion, the trial court instead must consider the evidence in the light most favorable to the State, as explained by this court in State v. Blanton, 926 S.W.2d 953, 957-58 (Tenn. Crim. App. 1996):

> When the trial court is presented with a motion for judgment of acquittal, the only concern is the legal sufficiency, as opposed to the weight, of the evidence. State v. Campbell, 904 S.W.2d 608 [(Tenn. Crim. App. 1995)]. To determine whether the evidence is insufficient to sustain the conviction, the trial court must consider "the evidence introduced by both parties, disregard any evidence introduced by the accused that conflicts with the evidence adduced by the State, and afford the State the strongest legitimate view of the evidence, including all reasonable inferences which may be drawn from the evidence." Id. (citing State v. Hall, 656 S.W.2d 60, 61 (Tenn. Crim. App. 1983)).

---

[5]In the present appeal, an issue is whether the trial court erred in reversing the conviction and dismissing the indictment count for murder in the perpetration of a burglary, one of the bases for this action being that the jury was erroneously instructed as to "assault." In the direct appeal of the defendant's conviction for especially aggravated burglary, the identical issue again would be raised.

[6]The Advisory Commission Comments to Rule 29 state that the purpose of allowing a thirty-day time period for the filing of a motion for judgment of acquittal, after the verdict is returned, is to permit both the judgment of acquittal and the ruling on the motion for new trial to be filed together, "indeed, the commission anticipates that this will be the case." See also Tenn. R. Civ. P. 50(c) (which is similar in scope and purpose with the criminal rule); Fed. R. Crim. P. 29(d) (the federal counterpart of our Rule 29(d)(2)).

In making its determinations in this matter as to the defendant's motion for new trial, the trial court should follow the procedure set out in Tennessee Rule of Criminal Procedure 33, regarding the motion for new trial, including Rule 33(d), which provides, in part, that "[t]he trial court may grant a new trial following a verdict of guilty if it disagrees with the jury about the weight of the evidence."

## CONCLUSION

Based upon the foregoing authorities and reasoning, we conclude that the State's appeal in this matter is premature. Accordingly, the matter is remanded to the trial court for a ruling on the motion for new trial and, then, entry of judgments resulting from the court's rulings. Since these judgments were entered prematurely following the court's granting the motion for judgment of acquittal, they are set aside, and the jury verdicts for second degree murder (Count 1), first degree murder in the perpetration of a burglary (Count 2), and aggravated assault (Count 4) are reinstated.

_____
ALAN E. GLENN, JUDGE