# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
## STATE OF TENNESSEE v. GEORGE GLENN FAULKNER

**Direct Appeal from the Criminal Court for Putnam County**
**No. 96-0245, Leon Burns, Jr., Judge**

---

**No. 01C01-9812-CR-00488 - Decided June 2, 2000**
**M1998-00066-CCA-R3-CD**

On April 10, 1997, the appellant, George Glenn Faulkner, was convicted by a jury in the Putnam County Criminal Court of first degree murder and attempted first degree murder. For the offense of first degree murder, the trial court imposed a sentence of life imprisonment in the Tennessee Department of Correction. For the offense of attempted first degree murder, the trial court sentenced the appellant as a standard, Range I offender to twenty-five years incarceration in the Department. Finally, the trial court ordered consecutive service of the appellant's sentences. In this appeal as of right, the appellant presents the following issues for our review: (1) whether the evidence adduced at the appellant's trial is sufficient to sustain his convictions of first degree murder and attempted first degree murder; (2) whether the trial court erred in refusing to admit at trial testimony concerning prior statements by the appellant; and (3) whether the trial court erred in ordering consecutive service of the appellant's sentences. Following a review of the record and the parties' briefs, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

OGLE, J., delivered the opinion of the court, in which WADE, P.J., joined. PEAY, J., not participating.

John Philip Parsons, Cookeville, Tennessee, for the appellant, George Glenn Faulkner.

Paul G. Summers, Attorney General and Reporter, Lucian D. Geise, Assistant Attorney General, Ben Fann, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION
### Factual Background

On April 15, 1996, a Putnam County Grand Jury returned an indictment charging the appellant in Count One with the first degree, premeditated murder of his wife's boyfriend, Harvey Glen "Arlis" Bilbrey, on September 24, 1995, and in Count Two with attempting the first degree, premeditated murder of his wife, Nancy Faulkner Brooks,[1] on the same day. The appellant's case proceeded to trial on April 7, 1998. At the trial, the State presented the testimony of Ms. Brooks. She recounted that she married the appellant in 1984 and, thereafter, resided with him in Florida for

---

[1]Since the appellant's offenses, Ms. Brooks has divorced the appellant and remarried.

almost eleven years before moving to Tennessee. She characterized her marriage as "[v]ery miserable, very strained, extremely difficult." She explained that, during her marriage, the appellant was involved in an ongoing and heated legal dispute concerning his visitation with his daughter from a prior marriage. Moreover, the stress stemming from this legal dispute was compounded by the appellant's behavior toward Ms. Brooks. Specifically, the appellant closely and jealously monitored Ms. Brooks' activities, periodically threatening suicide in order to control her behavior and prevent her from terminating their relationship. Moreover, the appellant began to exhibit abusive behavior toward Ms. Brooks' daughter, Amanda.[2]

In 1995, notwithstanding their troubled marriage, the couple decided to move to Tennessee and, accordingly, purchased a home in Putnam County. Ms. Brooks and her daughter, Amanda, moved into the new home on June 15, 1995. The appellant's sister, Karen Cooper, and her family also accompanied Ms. Brooks. The appellant, however, remained in Florida in order to conclude business.

During the appellant's absence, Ms. Brooks resolved to divorce the appellant and, at the end of June 1995, informed the appellant of her decision. Consequently, the appellant drove from Florida to Tennessee on the weekend of July 4 and attempted, unsuccessfully, to persuade Ms. Brooks to reconsider her decision. The appellant soon returned to Florida, but the couple continued to speak daily on the telephone. During these conversations, the couple frequently argued about Ms. Brooks' decision to divorce the appellant, and, on several occasions, the appellant threatened to commit suicide.

In mid-July, Ms. Brooks met Arlis Bilbrey and, approximately one week later, accepted his invitation to a local gas station for a cup of coffee. At the gas station, they sat at a picnic table outside and talked. Ms. Brooks confided to Mr. Bilbrey her plans to divorce her husband and apparently also discussed the possibility of dating Mr. Bilbrey. According to Ms. Brooks, she and Mr. Bilbrey agreed to wait until the divorce to initiate a relationship.

Subsequently, Ms. Brooks told the appellant about her "date" with Mr. Bilbrey. Initially, the appellant did not seem to be terribly angry. Rather, he simply asked Ms. Brooks to postpone making a final decision about the divorce until the following year. Soon, however, the appellant began to threaten suicide once again and also threatened to kill Ms. Brooks and Mr. Bilbrey.

On July 27, the appellant made a surprise visit to Tennessee, arriving unexpectedly at Ms. Brooks' workplace. He accused Ms. Brooks of having sexual relations with her male co-workers and again threatened to commit suicide. Ms. Brooks persuaded the appellant to go to a nearby hotel and rest until she was able to leave work. After work, Ms. Brooks visited the appellant at the hotel, and the couple began to argue about the divorce. During the course of their argument,

---

[2]Amanda is Ms. Brooks' daughter from a prior marriage. The appellant adopted Amanda in 1986.

the appellant barricaded the door to the hotel room and threatened to kill both Ms. Brooks and himself. According to Ms. Brooks, the appellant additionally stated that Mr. Bilbrey "was an old man with a shriveled up [penis] and he was going to cut it off and cram it down [Ms. Brooks'] throat, and why would [she] want that when [she] could have [the appellant]." The appellant then forcibly engaged in sexual intercourse with Ms. Brooks.

Later, on the same evening, the appellant informed Ms. Brooks that he hated her and that, in 1986, he had visited prostitutes in an attempt to contract AIDS and infect her with the disease. He also stated that he had impregnated one of their neighbors in Florida and had paid for her abortion. Following these confessions, the appellant appeared resigned to a divorce and returned to Florida.

In August, Ms. Brooks and Mr. Bilbrey began having an affair. Meanwhile, the appellant continued to make surprise visits to Tennessee, alternating between threats against Ms. Brooks' and Mr. Bilbrey's lives and acceptance of both the divorce and Ms. Brooks' relationship with Mr. Bilbrey. Ultimately, due to her fear of the appellant, Ms. Brooks moved into Mr. Bilbrey's home in Monterey.

In September, approximately ten days prior to the appellant's offenses, the appellant telephoned Ms. Brooks from Florida. He informed Ms. Brooks that she was "running out of chances and that [she'd] better change her mind." He reiterated that he intended to kill Ms. Brooks, Mr. Bilbrey, and himself. Ms. Brooks then heard a "pop" over the telephone followed by silence. For one moment, Ms. Brooks believed that the appellant had shot himself, and she began to panic. The appellant, however, began laughing and stated, "I just wanted to see what you'd do. I wanted to see if you loved me or not." The appellant further stated that he had purchased a 9 millimeter Beretta pistol. Later, the appellant called Ms. Brooks again and apologized for threatening her. He seemed resigned to the pending divorce, assuring Ms. Brooks that he intended to sign the necessary divorce papers on the following Monday. Both the appellant and Ms. Brooks agreed that, in the future, they would communicate solely in writing.

On September 24, Ms. Brooks and Mr. Bilbrey went to a local restaurant in Monterey for breakfast and discussed the possibility of reporting the appellant's erratic behavior to the local police department. Subsequently, as they were leaving the restaurant, Ms. Brooks noticed a black Toyota pickup truck outside the restaurant. Ms. Brooks was troubled, because the appellant had recently purchased an identical truck. Nevertheless, Ms. Brooks and Mr. Bilbrey got into their car, and Mr. Bilbrey began to drive them home. They soon noticed, however, that the black truck was following them, and they decided to stop at a nearby gas station. As they pulled into the gas station, the truck rammed their car, pinning the car against a pole. The appellant then jumped out of the truck and began shooting steadily at their car. Two bullets struck Mr. Bilbrey in the arm and shoulder before he and Ms. Brooks managed to drive away.

The appellant pursued the two victims, who immediately drove to the local police station. However, when Ms. Brooks and Mr. Bilbrey arrived at the police station, there were no cars parked in the parking lot. Accordingly, they drove into the parking lot of the nearby Goff Funeral

Home and attempted to turn their car around. At this point, the appellant caught up to them and again rammed their car. Ms. Brooks testified that the appellant's truck was traveling at a speed of fifty-five or sixty miles per hour when it hit their car, and the force of the impact caused their car to spin.

When the car stopped spinning, the appellant jumped out of his truck and began firing his weapon into the car. According to Ms. Brooks, the appellant appeared to be targeting both Mr. Bilbrey and herself. Specifically, she testified, "And at the funeral home after Arlis took I think two or three more bullets, [the appellant] put his hand up under [the pistol] and it was like he was trying to shoot around to the passenger seat or past Arlis."

When the bullets struck Mr. Bilbrey, his foot pressed down on the accelerator and the car lunged forward into the Goff Funeral Home. Following the collision, Ms. Brooks attempted to lie still inside the car and feign death, instructing Mr. Bilbrey to do likewise. She then heard the appellant walk around the car to the passenger side, clear away debris, and open the door. The appellant grabbed Ms. Brooks' head and laughed. He remarked, "Isn't it ironic? I killed the bitch and her boyfriend and they crashed into a funeral home." As the appellant released Ms. Brooks' head, he further stated, "Goddam it, why can't I kill myself." Ms. Brooks continued to lie still with her eyes closed, but the appellant grabbed her head once again. Ms. Brooks testified that she felt a hard object pressing against her head, and the appellant said, "Nancy, you're going to talk to me. . . ."

At that moment, Terry Rizor, an officer with the Monterey Police Department, arrived at the scene of the shooting. Officer Rizor testified on behalf of the State that, when he arrived at the Goff Funeral Home, he observed that a car had crashed into the funeral home. The officer then observed the appellant step from behind the wrecked car and place a pistol under his own chin. The appellant appeared to be "real excited." Officer Rizor drew his weapon and asked the appellant to drop the pistol. The appellant refused, stating to the officer, "I've done what I came here to do. Now I have to die." Subsequently, he asked Officer Rizor to shoot him, informing the officer that he had "told them what would happen and they wouldn't listen; now look what's happened, I've killed them."

During the course of his conversation with the appellant, Officer Rizor realized that there were two people inside the wrecked car and also heard a female voice calling for help. When the appellant heard the voice, he began to move toward the car but stopped when Officer Rizor threatened to shoot him. The appellant asked the officer to assist Ms. Brooks. Officer Rizor, in turn, asked the appellant to drop his pistol. The appellant finally complied with the officer's request, placing his pistol in a holster and laying the pistol on the funeral home porch.

Billy E. Parrot, an officer with the Putnam County Sheriff's Department, also testified on behalf of the State that, on September 24, 1995, he was dispatched to the Goff Funeral Home. When he arrived, Officer Rizor and the appellant were engaged in a standoff. As soon as the appellant surrendered his weapon, Officer Parrot ran to the victims' car. Upon removing the victims from the car, the officer observed that Mr. Bilbrey had been shot and appeared to be dead. Ms.

-4-

Brooks was covered in Mr. Bilbrey's blood but had not sustained any injuries. Paramedics soon arrived and confirmed that Mr. Bilbrey was dead.

Officer Parrot subsequently searched the appellant's black Toyota pickup truck. Inside, he found maps of Putnam County, including a handwritten map providing directions to Mr. Bilbrey's home, and a telephone book with Mr. Bilbrey's name and address highlighted. Officer Parrot also investigated Mr. Bilbrey's home and the immediately surrounding area. He discovered "knobby" tire tracks in a neighbor's driveway that resembled the tread of the tires on the appellant's truck.

Donald Pierce, a detective with the Putnam County Sheriff's Department, testified on behalf of the State that the pistol surrendered by the appellant to the police was a 9 millimeter Beretta. There were three bullets remaining in the ammunition clip and one bullet in the chamber of the pistol. Moreover, according to Detective Pierce, a search of the appellant's pickup truck revealed another, empty ammunition clip or magazine and a gun case containing a fully loaded magazine, in addition to the aforementioned maps and telephone book. Finally, Detective Pierce testified that an inspection of the victims' car revealed bullet holes and spent bullets in the driver's side of the car and at least one spent bullet in the passenger's side of the car.

Marvin Neal, a friend of the appellant and Mr. Bilbrey's brother-in-law, also testified on behalf of the State at the appellant's trial. He related to the jury that he spoke with the appellant fairly frequently prior to these offenses. During Mr. Neal's conversations with the appellant, the appellant threatened to kill Ms. Brooks, Mr. Bilbrey, and himself. According to Mr. Neal, the appellant stated, ". . . Bilbrey better not ever cross my path." Mr. Neal also recalled that, prior to the shooting, the appellant asked him questions concerning the type of car Mr. Bilbrey drove, Mr. Bilbrey's place of employment, and places where Mr. Bilbrey could be found after work.

Roger Anderson, Mr. Bilbrey's neighbor, testified on behalf of the State that, on the morning of the shooting, he noticed a black Toyota pickup truck driving slowly by his house. Minutes later, the same truck drove by his house, headed in the opposite direction.

On the day following the shooting, Ms. Brooks visited the appellant's Florida residence, where she discovered several used bulls-eye targets, unused silhouette targets, and bullets. Hoyt Eugene Phillips, a special agent with the Tennessee Bureau of Investigation, testified that he examined the nine shooting targets discovered by Ms. Brooks. Latent fingerprints on three of the bulls-eye targets matched the appellant's fingerprints. Latent fingerprints on several other targets did not match the appellant's fingerprints. Finally, "smudges" on several targets were not susceptible to comparison.

Dr. Charles W. Harlan, an expert in the field of forensic pathology, testified at the appellant's trial that he performed Mr. Bilbrey's autopsy. According to Dr. Harlan, Mr. Bilbrey died as a result of six bullet wounds and accompanying blood loss. Dr. Harlan opined that the wounds were caused by five different bullets. He concluded that either of two bullet wounds to the victim's chest would have been fatal.

In defense, the appellant essentially presented testimony in support of the proposition that, prior to the shooting and at the time of the shooting, he was in a state of passion caused by Ms. Brooks' termination of their relationship and Ms. Brooks' affair with Mr. Bilbrey. Brad Green, Ms. Brooks' stepbrother, testified on behalf of the appellant that, contrary to Ms. Brooks' testimony, Ms. Brooks was the controlling or "manipulative" partner in the Faulkner marriage. According to Mr. Green, Ms. Brooks told the appellant "what to do and when to do it." Mr. Green never observed the appellant exhibit abusive behavior toward Ms. Brooks or her daughter, and Ms. Brooks never mentioned to Mr. Green any abusive behavior. Finally, Mr. Green testified that, when Ms. Brooks announced her intention to divorce the appellant, the appellant became

> despondent. He was extremely upset. He would go through crying jags. He felt that his world was falling apart. . . . He could not understand why his marriage was dissolving. . . . He would alternately laugh over what fate had handed him and cry within a 30 second period of time. Like anyone else, he was just physically upset.

Karen Cooper, the appellant's sister, also testified on behalf of the appellant that, after learning of his impending divorce, the appellant became extremely depressed and frequently discussed the possibility of committing suicide. Indeed, at one point, Ms. Cooper considered pursuing her brother's involuntary commitment to a psychiatric hospital. Similarly, Robert Michael Donahue, one of the appellant's co-workers in Florida, testified that the prospect of divorce precipitated a complete change in the appellant's demeanor. For example, the appellant lost weight, he began "breaking down on the job site," he discussed suicide on several occasions, and his hands shook constantly. Jeffrey Scott Smith, the appellant's employer, added that, in August and September of 1995, the appellant began to arrive at work late or not at all. On two or three occasions, the appellant appeared to be on the verge of tears. Finally, on September 22, 1995, two days before the shooting, the appellant remarked to his employer that he felt tired and wanted to "give up."

Linda Schoonover, a family law attorney licensed in Florida, testified on behalf of the appellant that, in 1994, she advised the appellant and Ms. Brooks concerning a child custody dispute. At that time, Ms. Schoonover believed that the Faulkners' marriage was happy and stable. However, in early August of 1995, the appellant again visited her office, informed her that his wife wanted a divorce, and asked that she represent him. The appellant was "very upset, in tears." Accordingly, Ms. Schoonover spoke with Ms. Brooks and suggested marriage counseling. Ms. Brooks rejected her suggestion and declined to explain to Ms. Schoonover her reasons for seeking a divorce. Subsequently, on numerous occasions, the appellant visited Ms. Schoonover or spoke with her on the telephone concerning the divorce. Ms. Schoonover testified that the appellant appeared despondent, and she quickly became concerned that the appellant would hurt himself. She briefly considered the possibility of involuntary commitment proceedings but ultimately advised the appellant to seek psychological counseling.

Finally, Greg Whittaker and Pat Story, both officers with the Putnam County Sheriff's Department, testified on behalf of the appellant. Officer Whittaker recounted that,

immediately after the appellant's arrest, as the officer was transporting the appellant to the Putnam County Jail, the appellant began crying and hyperventilating. Officer Story further testified that, when the appellant arrived at the Putnam County Jail, he was "upset, crying, just visibly disturbed." The appellant stated to Officer Story, "Dammit, damn my soul . . . I should have just killed myself."

Following the parties' presentation of proof, the trial court instructed the jury on the following offenses pursuant to Count I of the indictment pertaining to Mr. Bilbrey: first degree murder; second degree murder; voluntary manslaughter; reckless homicide; and criminally negligent homicide. With respect to Count II of the indictment pertaining to Ms. Brooks, the trial court instructed the jury on the following offenses: attempted first degree murder; attempted second degree murder; and attempted voluntary manslaughter. Again, the jury found the appellant guilty of the first degree murder of Mr. Bilbrey and the attempted first degree murder of Ms. Brooks.

## Analysis

### I.      Sufficiency of the Evidence

The appellant first contends that the evidence adduced at trial is insufficient to sustain the jury's verdicts. In Tennessee, appellate courts accord considerable weight to the verdict of a jury in a criminal trial. In essence, a jury conviction removes the presumption of the appellant's innocence and replaces it with one of guilt, so that the appellant carries the burden of demonstrating to this court why the evidence will not support the jury's findings. State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). The appellant must establish that "no reasonable trier of fact" could have found the essential elements of the offenses beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); Tenn R. App. P. 13(e).

Accordingly, on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn therefrom. State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983). In other words, questions concerning the credibility of witnesses and the weight and value to be given the evidence, as well as factual issues raised by the evidence, are resolved by the trier of fact, and not the appellate courts. State v. Pruett, 788 S.W.2d 559, 561 (Tenn. 1990).

With respect to the appellant's conviction of first degree murder, the State was required to prove beyond a reasonable doubt that the appellant killed Mr. Bilbrey intentionally and with premeditation. Tenn. Code Ann. § 39-13-202(a)(1) (1995). "[A] person . . . acts intentionally with respect to the nature of the conduct or to a result of the conduct when it is the person's conscious objective or desire to engage in the conduct or cause the result." Tenn. Code Ann. § 39-11-302(a) (1997); see also Tenn. Code Ann. § 39-11-106(a)(18) (1995). A premeditated act additionally requires the prior exercise

> of reflection and judgment. 'Premeditation' means that the intent to
> kill must have been formed prior to the act itself. It is not necessary
> that the purpose to kill pre-exist in the mind of the accused for any
> definite period of time. The mental state of the accused at the time
> the accused allegedly decided to kill must be carefully considered in
> order to determine whether the accused was sufficiently free from

excitement and passion to be capable of premeditation. Tenn. Code Ann. § 39-13-202(d). "At the same time, if a defendant becomes impassioned later, but 'the intent to kill was formed as a result of premeditation . . . prior to the crime, it is immaterial that the act was carried out in a state of passion.'" State v. Sims, No. W1998-00634-CCA-R3-DD, 2000 WL 298901, at *7 (Tenn. Crim. App. at Jackson, March 14, 2000)(citations omitted).

With respect to the appellant's conviction of attempted first degree murder, the State was required to prove beyond a reasonable doubt that the appellant acted intentionally and with premeditation to kill Ms. Brooks. Tenn. Code Ann. § 39-12-101(a) (1997). Specifically, the State was required to prove that the appellant

> act[ed] with intent to complete a course of action or cause a result that would constitute [first degree murder], under the circumstances surrounding the conduct as the [appellant] believe[d] them to be, and the conduct constitute[d] a substantial step toward the commission of the offense.

Tenn. Code Ann. § 39-12-101(a)(3).

The appellant alleges that the State failed to prove beyond a reasonable doubt that he acted with premeditation.[3] He argues that, even assuming his intent to kill both Mr. Bilbrey and Ms. Brooks, the evidence adduced at trial at most established his guilt of voluntary manslaughter and attempted voluntary manslaughter.[4] According to the appellant, the evidence demonstrated that, prior to the shooting and at the time of the shooting, he was acting "in a state of passion produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner," the adequate provocation being his wife's affair with Mr. Bilbrey. Tenn. Code Ann. § 39-13-211(a) (1997).

Initially, "[n]ot every provocation will reduce killing to manslaughter, for the resentment must bear a reasonable proportionality to the provocation." State v. Jesperson, No. 03C01-9206-CR-00212, 1993 WL 305781, at *7 (Tenn. Crim. App. at Knoxville, August 11, 1993). See also State v. Skidmore, No. 03C01-9502-CR-00039, 1997 WL 199061, at *8 (Tenn. Crim. App. at Knoxville, April 24, 1997)(in evaluating the adequacy of provocation under the voluntary manslaughter statute, a court must employ an objective standard). Thus, although our supreme court has noted the "well settled legal principle" that marital infidelity "is an act obviously calculated to arouse ungovernable passion," State v. Thornton, 730 S.W.2d 309, 312 (Tenn. 1987), the adequacy

---

[3]The appellant also argues in his brief that the State failed to prove beyond a reasonable doubt that he acted with deliberation. However, the State was not required to prove deliberation under the statute in effect at the time of the appellant's offenses. Tenn. Code Ann. § 39-13-202(a)(1).

[4]We note in passing that voluntary manslaughter *is* a lesser included offense of first degree murder under the test announced in State v. Burns, 6 S.W.3d 453, 466-467 (Tenn. 1999). See Sims, No. W1998-00634-CCA-R3-DD, 2000 WL 298901, at *13.

of the provocation depends upon the circumstances of each case, including whether the defendant was separated or divorced from his spouse and whether the defendant actually witnessed intimate activity between a spouse and a paramour. See, e.g., Jesperson, No. 03C01-9206-CR-00212, 1993 WL 305781, at *7. Moreover, the passage of time following the discovery of marital infidelity, sufficient for any passion or emotion of a defendant to cool, might warrant a verdict of murder. Thornton, 730 S.W.2d at 313. See also Jesperson, No. 03C01-9206-CR-00212, 1993 WL 305781, at *7.

In this case, the appellant and Ms. Brooks were separated and engaged in divorce proceedings at the time of Ms. Brooks' affair with Mr. Bilbrey. Moreover, the appellant never witnessed any intimate activity between Ms. Brooks and Mr. Bilbrey.[5] Finally, by the time the appellant observed his wife and Mr. Bilbrey leaving the restaurant in Monterey on the morning of the shooting, the appellant had known of his wife's affair with Mr. Bilbrey for at least one month, since his wife began living with Mr. Bilbrey in Mr. Bilbrey's Monterey home. Under these circumstances, the jury's rejection of the notion of adequate provocation was well within its prerogative.

That having been said, a homicide committed or attempted in the heat of passion without adequate provocation is second degree murder or the attempt thereof unless the State establishes the element of premeditation beyond a reasonable doubt. State v. Brown, 836 S.W.2d 530, 543 (Tenn. 1992). Of course, the circumstances surrounding the killing may suffice to satisfy the State's burden. See State v. Pike, 978 S.W.2d 904, 914 (Tenn. 1998), cert. denied, 526 U.S. 1147, 119 S.Ct. 2025 (1999); State v. Bland, 958 S.W.2d 651, 660 (Tenn. 1997); Brown, 836 S.W.2d at 539; State v. Burlison, 868 S.W.2d 713, 717 (Tenn. Crim. App. 1993). Specifically, the following factors will support a jury's inference of premeditation: (1) Facts about the defendant's prior relationship to the victim from which motive may be inferred; (2) Declarations by the defendant of an intent to kill; (3) Planning activities by the defendant before the killing, including the procurement of a weapon or preparations for concealment of the crime; (4) The nature of the killing, including the defendant's use of a deadly weapon upon an unarmed victim, the killing of the victim while the victim is retreating or attempting to escape, or the particular cruelty of the killing; (5) The defendant's demeanor before and after the killing, including calmness immediately after the killing. Pike, 978 S.W.2d at 914-15; Bland, 958 S.W.2d at 660 (citing Brown, 836 S.W.2d at 541-42, and State v. West, 844 S.W.2d 144, 148 (Tenn. 1992)); State v. Gentry, 881 S.W.2d 1, 4-5 (Tenn. Crim. App. 1993); State v. Anderson, 835 S.W.2d 600, 605 (Tenn. Crim. App. 1992). With respect to the nature of the killing, repeated shots or blows will not alone establish premeditation but may be considered along with other circumstances in assessing the existence of premeditation.

---

[5]Ms. Brooks testified that, in August, before she moved into Mr. Bilbrey's home, the appellant informed her that he had hired a private detective, who had taken photographs of her and Mr. Bilbrey. Although the appellant was aware of the subject of the photographs, the appellant had not yet seen the photographs. Subsequently, both the appellant and Ms. Brooks agreed that they would not look at the photographs, as "it wasn't going to be beneficial to anything." Accordingly, the appellant destroyed the photographs.

Brown, 836 S.W.2d at 542.

Again, the evidence adduced at trial reflects that, during the months preceding the shooting, the appellant was alternately angered by and resigned to his impending divorce and his wife's relationship with Mr. Bilbrey. During this time period, the appellant repeatedly threatened both Ms. Brooks' and Mr. Bilbrey's lives. Moreover, less than two weeks prior to the shooting, the appellant purchased a 9 millimeter Beretta pistol in Florida and practiced target shooting. The appellant also obtained directions to Mr. Bilbrey's home, where Ms. Brooks was currently residing with Mr. Bilbrey. The appellant similarly asked Mr. Bilbrey's brother-in-law for information concerning Mr. Bilbrey's car, his employment, and, generally, his daily activities. Following these preparations, the appellant drove from Florida to Tennessee, carrying with him his pistol and extra ammunition clips and bullets. Upon arriving in Tennessee, the appellant first drove past Mr. Bilbrey's home and, subsequently, located Ms. Brooks and Mr. Bilbrey at a local restaurant. After following the victims for a short distance, the appellant rammed their vehicle with his truck and repeatedly fired his weapon into their vehicle. When the victims fled, the appellant pursued them, cornered them in a parking lot, rammed their vehicle with his truck once again, and discharged more bullets into the vehicle. Finally, believing that both victims were dead, the appellant laughed, remarking upon the irony of their deaths at a funeral home. Upon the arrival of the police, the appellant apparently did become "real excited," but he also confessed to Officer Rizor that he had "done what [he] came . . . to do." As to the appellant's repeated threats to commit suicide before and after the shooting, the record reflects that these threats were more a function of habit and manipulation than the product of any passion. In sum, the record amply supports the jury's determination that the appellant "was sufficiently free from excitement and passion to be capable of premeditation." Tenn. Code Ann. § 39-13-202(d).

The appellant also argues that the record does not support the jury's determination that he intended to kill Ms. Brooks in addition to Mr. Bilbrey. We disagree. Again, the appellant's threats prior to the shooting encompassed Ms. Brooks. Significantly, the appellant executed his planned attack when Ms. Brooks and Mr. Bilbrey were together, ramming his truck into a vehicle containing both Ms. Brooks and Mr. Bilbrey. Moreover, Ms. Brooks testified that, during the shooting, the appellant appeared to be directing bullets toward her. Finally, at least one bullet was recovered from the passenger side of the vehicle. This issue is without merit.

## II.    Testimony Concerning Prior Statements by the Appellant

The appellant next argues that the trial court erred in refusing to admit at trial the testimony of his sister, Kathy Carter, concerning his prior statements. Defense counsel proffered Ms. Carter's testimony during a jury-out hearing, indicating that Ms. Carter intended to describe her telephone conversation with the appellant on the day before the instant offenses, immediately prior to the appellant's trip to Tennessee. During this telephone conversation, the appellant stated to Ms. Carter that he intended to drive to Tennessee and commit suicide, because he wanted Ms. Brooks to find his body in the home that they had purchased together in Tennessee.

The State objected to the introduction of the proffered testimony, arguing that the appellant's statements to Ms. Carter were self-serving. The State explained that the sole conceivable

purpose of introducing the statements was to demonstrate that, on the occasion of the instant offenses, the appellant traveled to Tennessee intending to kill himself rather than Ms. Brooks or Mr. Bilbrey. Defense counsel denied that he was seeking to introduce the appellant's statements to Ms. Carter in order to establish the truth of the matter asserted in the statements. Rather, counsel argued that he was attempting to show the appellant's state of mind prior to and at the time of the shooting. The trial court concluded that the statements were self-serving and, therefore, inadmissible.

Initially, it has long been held in Tennessee that, generally, a defendant may not introduce self-serving statements without testifying. See, e.g., State v. King, 694 S.W.2d 941, 945 (Tenn. 1985); Moon v. State, 242 S.W. 39, 54 (Tenn. 1922); State v. Belser, 945 S.W.2d 776, 784 (Tenn. Crim. App. 1996); State v. Brooks, 909 S.W.2d 854, 862-863 (Tenn. Crim. App. 1995); State v. Turnmire, 762 S.W.2d 893, 897 (Tenn. Crim. App. 1988); State v. DePriest, 697 S.W.2d 597, 602 (Tenn. Crim. App. 1985); State v. Hall, 552 S.W.2d 417, 418 (Tenn. Crim. App. 1977); State v. DeJongh, No. 03C01-9806-CR-00211, 1999 WL 71796, at *4 (Tenn. Crim. App. at Knoxville, February 16, 1999). This rule simply acknowledges that such statements constitute hearsay if offered to prove the truth of the matter asserted therein and, like other hearsay evidence, are unreliable. See, e.g., NEIL P. COHEN, ET AL., TENNESSEE LAW OF EVIDENCE § 803(1.2).2, at 514 (Michie ed., 3d ed. 1995)(citing Turnmire, 762 S.W.2d at 897)(a declarant may not use his or her own statement as an admission under Tenn. R. Evid. 803(1.2)). In other words,

> "[t]he vital objection to the admission of [a self-serving declaration] is its hearsay character; the phrase 'self-serving' does not describe an independent ground of objection."

Palmer v. Nationwide Mutual Fire Insurance Company, 723 S.W.2d 124, 128 (Tenn. App. 1986)(citation omitted). See also Hassell v. Metropolitan Government of Nashville and Davidson County, No. 01A01-9310-CV-00459, 1994 WL 374515, at *2 (Tenn. App. at Nashville, July 13, 1994).

Thus, if a defendant's self-serving statement is offered for a purpose other than proving the truth of the matter asserted therein, the statement does not constitute hearsay and will be admissible unless excluded pursuant to some other rule of evidence. See State v. Roe, No. 02C01-9702-CR-00054, 1998 WL 7107, at *11 (Tenn. Crim. App. at Jackson, January 12, 1998), perm. to appeal denied, (Tenn.), cert. denied, 526 U.S. 1159, 119 S.Ct. 2049 (1999)("the key to determining whether a statement is hearsay is the purpose for which it is offered"). Again, defense counsel essentially argued at trial that the appellant's statements to Ms. Carter concerning his intent to travel to Tennessee and commit suicide, regardless of their truth, buttressed the defense's theory that, prior to these offenses and at the time of these offenses, the appellant was in a state of passion. See COHEN, supra, § 801.7 at 499 ("utterances offered for the *underlying implied* assertion that is circumstantially implicit in the literal spoken or written words" is often viewed as nonhearsay). See also Roe, No. 02C01-9702-CR-00054, 1998 WL 7107, at *10-11; State v. Goins, No. 03C01-9502-CR-00026, 1996 WL 438891, at *7-8 (Tenn. Crim. App. at Knoxville, July 30, 1996). We agree that, if proffered for this purpose, the appellant's statements to Ms. Carter were nonhearsay. Moreover, even assuming that the appellant proffered his statements to prove the truth of the matter asserted therein, i.e., that he did, in fact, plan to travel to Tennessee and commit suicide, we note that the statements would be encompassed by the state of mind exception to the hearsay rule. Tenn. R.

Evid. 803(3). Finally, evidence which tends to prove or disprove a required mental state is relevant and generally admissible pursuant to Tenn. R. Evid. 402 and 403. State v. Hall, 958 S.W.2d 679, 689 (Tenn. 1997). We acknowledge that "'[a]t some point, . . . mental state on one day may become irrelevant in assessing mental state far in the future or past.'" Goins, No. 03C01-9502-CR-00026, 1996 WL 438891, at *7 (citation omitted). Nevertheless, we conclude that the appellant's prior statements in this case were admissible. In any event, in light of the overwhelming evidence adduced at trial, the trial court's error was harmless, and the appellant is not entitled to relief. See Tenn. R. App. P. 36(b); Tenn. R. Crim. P. 52(a).

## III.    Consecutive Sentencing

Finally, the appellant argues that the trial court erred in imposing consecutive sentencing.[6] Appellate review of the manner of service of a sentence is de novo. Tenn. Code. Ann. § 40-35-401(d) (1997). In conducting its de novo review, this court considers the following factors: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the pre-sentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on enhancement and mitigating factors; (6) any statement by the defendant in his own behalf; and (7) the defendant's potential for rehabilitation or treatment. Tenn. Code. Ann. § 40-35-102, -103, -210 (1997). See also State v. Ashby, 823 S.W.2d 166, 168 (Tenn. 1991). The burden is upon the appellant to demonstrate the impropriety of his sentence. Tenn. Code. Ann. § 40-35-401, Sentencing Commission Comments. See also State v. Wilkerson, 905 S.W.2d 933, 934 (Tenn. 1995). Moreover, if the record reveals that the trial court adequately considered sentencing principles and all relevant facts and circumstances, this court will accord the trial court's determination a presumption of correctness. Tenn. Code. Ann. § 40-35-401(d); Ashby, 823 S.W.2d at 169.

Tenn. Code Ann. § 40-35-115(a) (1997) provides that a trial court may impose consecutive sentencing only upon the determination that a defendant meets one of the criteria listed therein. Moreover, if the trial court classifies a defendant as a dangerous offender pursuant to Tenn. Code Ann. § 40-35-115(b)(4), the court must also find that the defendant's sentence reasonably relates to the severity of his offenses and is necessary in order to protect the public from further criminal conduct by the defendant. Wilkerson 905 S.W.2d at 938. See also State v. Lane, 3 S.W.3d 456, 460-61 (Tenn. 1999).

In this case, the trial court found that the appellant is "a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high." Tenn. Code Ann. § 40-35-115(b)(4). The trial court explained:

> [W]hat's particularly disturbing to me is the manner in which [the offenses were] . . . committed. . . . [T]o drive. . .eight or ten hours . .

---

[6]The State suggests in its brief that the appellant is also challenging the length of his sentence for the offense of attempted first degree murder. However, the appellant's brief does not reflect any such challenge.

.with this feeling and then to just in two separate incidences attempt to kill in the presence of the public and many witnesses would in my mind satisfy the statute that the circumstances justify a dangerous offender finding. . . .

As the State concedes, the trial court failed to make the additional findings required by our supreme court in <u>Wilkerson</u> and <u>Lane</u>.

Exercising our power of de novo review, we conclude that the trial court properly imposed consecutive sentencing. We agree with the trial court that the circumstances of the instant offenses justify a dangerous offender classification. Moreover, the appellant's aggregate sentence reasonably relates to the severity of these offenses. Finally, we conclude that the appellant's sentence is necessary in order to protect the public from further criminal conduct by the appellant. In this regard, we note that, according to Ms. Brooks' testimony at the sentencing hearing, the appellant has previously engaged in violent, criminal behavior. Moreover, the record reflects poor potential for rehabilitation. For example, Ms. Brooks testified that, at the time of the sentencing hearing, the appellant was persisting in attempts to contact her. We additionally note that, at the time of the instant offenses, the appellant was released on bond by the Orange County Circuit Court in Florida pursuant to a charge of felony aggravated battery. Finally, the record supports the trial court's finding that the appellant has failed to accept responsibility for the instant offenses, assigning the greater blame to Ms. Brooks. This issue is without merit.

## Conclusion

For the foregoing reasons, we affirm the judgments of the trial court.