IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT  KNOXVILLE

AUGUST 1999 SESSION

FILED

October 19, 1999

Cecil Crowson, Jr.
Appellate Court Clerk

STATE OF TENNESSEE,          )
                             )
         Appellee,           )          No. 03C01-9808-CR-00314
                             )
                             )          McMinn County
v.                           )
                             )          Honorable Carroll L. Ross, Judge
                             )
JOHN WILCOX,                 )          (Second degree murder)
                             )
         Appellant.          )


For the Appellant:                      For the Appellee:

William J. Brown                        Paul G. Summers
23 N. Ocoee Street                      Attorney General of Tennessee
Post Office Box 1001                             and
Cleveland, TN 37364-1001                Erik W. Daab
                                        Assistant Attorney General of Tennessee
                                        425 Fifth Avenue North
                                        Nashville, TN 37243-0493

                                        Jerry N. Estes
                                        District Attorney General
                                        130 Washington Avenue, NE
                                        Post Office Box 647
                                        Athens, TN 37371


OPINION FILED:_____


AFFIRMED

Joseph M. Tipton
Judge

OPINION

The defendant, John Wilcox, appeals as of right from his conviction by a jury in the McMinn County Criminal Court for second degree murder, a Class A felony. The defendant was sentenced to fifteen years confinement in the custody of the Department of Correction. On appeal, he raises the following issues:

> (1) whether the evidence is sufficient to support the conviction;

> (2) whether the trial court erred by denying the defendant the opportunity to cross-examine the pathologist regarding the identity of the body;

> (3) whether the district attorney committed prosecutorial misconduct by repeatedly referring to the defendant's exercise of his constitutional rights; and

> (4) whether the trial court erred by allowing the district attorney to argue facts that had not been introduced into evidence regarding the county's shoestring budget.

We affirm the judgment of conviction.

At trial, Chad Smith, a patrol officer with the McMinn County Sheriff's Department, testified that on August 10, 1997, he was dispatched to the defendant's house at around 7:30 or 8:00 p.m. on the report of a burglary. Officer Smith testified that the defendant told him that someone had broken into his home but that he did not know who it could have been. Officer Smith said the defendant told him that he was missing an answering machine, a telephone and jewelry. He said the defendant showed him horse hoof prints and boot prints. He said the defendant stated that one boot print looked like a man's, and the other looked like a woman's.

Officer Smith testified that he wrote a report and told the defendant that a detective would contact him the next day. He said he also told the defendant to call the sheriff's department to report the value of the jewelry and to notify them if he had any leads. Officer Smith said he did not take fingerprints because he is not certified. He

2

said he notified Detective Jerry Wilson of the burglary that night. He testified that around midnight, he received a dispatch regarding a gunshot victim.

Officer Smith testified that when he arrived at County Road 110, the scene of the shooting, he saw the victim, Terry Bohannon, lying on the road and struggling to breathe. He said the victim had several gunshot wounds and cuts. He said that after emergency services arrived, he examined the scene and noticed a bloody horse that appeared to be dead. He said he also noticed a saddlebag containing a telephone and an answering machine. He said he did not find any knives or guns in the victim's vicinity. He said he found shell casings and a long black sword sleeve in the middle of the road, about ten to twenty feet from the victim.

Officer Smith testified that he did not speak with the defendant's neighbors about the burglary because he received another dispatch and did not have time. He said that at the preliminary hearing, he testified that he called Detective Wilson around 10:00 p.m. to notify him of the hoof and boot prints.

Michael Guffey testified that the incident occurred about one and one-half miles from his house. He said he was friends with both the victim and the defendant. He said that on August 10, the victim came by his house on horseback with Melissa Linder around 11:00 p.m. He said the victim stayed about five minutes then left. He said the victim returned around midnight and said his horses had gotten loose and he needed help catching them. Mr. Guffey said he got his fourteen-year-old son David out of bed, and they found the horses in a neighbor's field. He said that David and the victim caught the horses while he took Ms. Linder home in his van. He said that when he got back to the neighbor's field, he told the victim to take the horses home. He said he did not recall seeing the victim armed.

Mr. Guffey said the defendant then stopped behind him. He said the victim and David were behind his van, but he could see them through the mirrors. He said David came to the window of the van, and then he heard three gunshots. He said David crawled into the van and said, "They're shooting." He said he pulled out, drove to a fork in the road, turned around, and headed back in the direction of the shooting. Mr. Guffey said the defendant also turned around in his van and pulled up beside him. He said the defendant stated that the victim had broken into his house and stolen his dead mother's jewelry. He said the defendant stated that he had left the victim lying in the road and that he hoped the "son-of-a-bitch" was dead. Mr. Guffey said the defendant then stated, "I'm going after her." Mr. Guffey said he pulled out and saw the victim lying in the road. He said he drove to his mother's house to call 9-1-1, then he went back to the scene. He said the defendant acted angry but not crazy. He said the defendant did not mention anything about the victim attacking him. He said the victim was calm that night and seemed as if he had been drinking but was not drunk.

Mr. Guffey testified that when he was interviewed by the police on August 12, he did not tell them that the victim had stopped by his house earlier in the evening on the night of the incident. He said he did not remember the defendant driving behind him and asking him to stop as he was driving back toward the victim after dropping off Ms. Linder. He said he told an investigator that he could not see the altercation between the defendant and the victim, but he could tell that a fight was occurring. He testified that he heard three shots fired. He said the defendant never accused him of being involved in the burglary. Mr. Guffey testified that when he drove by the victim's body after the shooting, the victim was not breathing or moving, and he thought the victim might be dead.

David Guffey, the fourteen-year-old son of Michael Guffey, testified that on August 11, his father awoke him to help the victim find his horses because the victim

4

and Ms. Linder had fallen off the horses, and the horses had gotten loose. David said he was friends with both the defendant and the victim. He said he and the victim caught the horses while his dad drove down the road to look for Ms. Linder. He said he and the victim caught up with his father, who told the victim to take the horses home. He said the defendant then arrived. David said that he was on a horse at the back right side of his father's van, and the defendant said, "Get off your horse; you don't need to see this." David said he got off the horse, and the victim remained on his horse. He said the defendant then stated that some things were missing from his house and that some neighbors had seen the victim around the area. He said the defendant and victim began to argue, and the defendant began to hit the victim with what appeared to be a three-foot long black stick. He said the victim asked, "What's going on?"

David Guffey said that he did not see the victim pull out any weapon. He said he lost sight of the two for a moment, then he saw the defendant walk toward his van and reach inside the van. David said his horse then stepped on his foot, and he turned his head away. He said he then heard gunshots. He said he did not know how many gunshots he heard. He said he jumped into his father's van and told him to leave. He said his father drove down the road and turned around. He said that when they drove toward the scene, the defendant pulled beside them. He testified that the defendant said his dead mother's jewelry was stolen and that he hoped "the s.o.b. was dead." David Guffey said his father pulled away and turned around. He said they drove past the victim, who was lying on the road and appeared to be breathing. He said they went to his grandmother's house and called 9-1-1. David testified that he had previously worked for the defendant at the defendant's house. He said he had heard the defendant say that he would kill anybody who stole from him.

David Guffey admitted that he did not tell the police about the defendant's threat to kill anyone who stole from him until the Friday before trial. He said that the victim

appeared intoxicated and was staggering. He said he never saw Ms. Linder that night. He said he did not see a duffel bag, chainsaw, sword or jewelry. He said he did not understand what the defendant and victim were saying to each other during the altercation. He said he did not remember whether the defendant accused his father of stealing.

Detective Jerry Wilson of the McMinn County Sheriff's Department testified that he received a call from Officer Chad Smith reporting a break-in at the defendant's house. He said he told Officer Smith to continue to take the report and to call him if he received any other pertinent information. He said he told Officer Smith that he would contact the defendant the next day. He testified that only two detectives were on duty that week.

Detective Wilson testified that between 12:00 and 1:00 a.m., he received a page regarding a possible shooting victim. He said he found three spent shells, a watch face and a scabbard in the road at the scene. He said he found a dead horse lying on the side of the road with a saddle, saddlebags, and a black bag hanging on it. He said a one-hundred-ten-foot blood trail linked the scabbard to the horse. Detective Wilson said that he spoke with the defendant in jail, and the defendant said that "the son-of-a-bitch had on my faggot bag."

Detective Wilson said that if he had seen the victim riding around town with the defendant's belongings, he would have stopped the victim and investigated. He said that if the victim had used force, he would have used equal force. He admitted that he did not send the saddlebag to the crime laboratory for analysis. He said that a search of the area revealed only three spent shells. He said that he did not know until the day before his testimony that the victim's body had four bullet holes. He said that he did not send the rifle or the four unspent shells that were recovered from the defendant's rifle to

6

the crime laboratory. He said that one of Mr. Guffey's children found the defendant's missing items in a field. He said he turned over the evidence to Detective Miller, who was handling the burglary investigation. He admitted that he did not dust the items for fingerprints, nor did he perform a serology test on any sword. He said he did not test for blood on the defendant's clothing because the defendant had changed clothes by the time he was arrested. He said that he obtained clothes from the defendant's home that matched what the defendant was purportedly wearing and that he sent them to the crime laboratory along with the spent shells.

Detective Wilson admitted that at the preliminary hearing, he testified that he did not take the defendant's clothing out of the bag because the clothes were wet and bloody. He admitted at trial that he could not see any blood on the clothes. He said that in one of the bags on the dead horse, he found a flashlight, a telephone and a tape recorder belonging to the defendant. He said these items were not clearly visible because they were in the bottom of the bag.

Dr. Ronald Toolsey, the Bradley County Medical Examiner, testified that he performed the autopsy of the victim on August 11. He said that Dr. William Foree, the McMinn County Medical Examiner, referred the case to him because Dr. Foree is not a pathologist and does not conduct post-mortem examinations. He said that he spoke with Dr. Foree before he conducted his examination and that Dr. Foree told him that the victim had multiple gunshot wounds. He said Dr. Foree did not mention chop wounds.

Dr. Toolsey testified that he discovered six bullet wounds incurred from a total of four shots, as well as two chop wounds. He testified that four of the bullet wounds were entrance wounds to the right side of the body, and two of the wounds were exit wounds. He said that two projectiles remained in the body, and only one was retrievable.

7

Dr. Toolsey testified that the recovered bullet had entered the right side of the chest, passed through the liver, and stopped in the lung. He said the second bullet entered at the back of the buttock, hit the hip bone and shattered. Dr. Toolsey testified that the other wounds were to the right lower extremity. He said that one bullet exited through the thigh, and the other exited through the upper right calf.

Dr. Toolsey testified that he found two major chop wounds. He said the wound to the back of the upper left leg was very deep and had gone through the muscles and outer bone, causing near amputation. He said the second wound was to the back of the right wrist and went completely through both bones such that the hand was connected to the arm by only a few tendons. He said the wounds would have completely incapacitated the victim's right hand and left leg, and the victim would have been unable to stand.

Dr. Toolsey testified that the victim died from blood loss due to the multiple gunshot and chop wounds. He testified that every wound was fatal except the bullet wound to the right leg, the other wounds being fatal because they would have caused the victim to bleed to death. He said the gunshot wound to the right buttock could have been fatal because the bullet tore through the intestines, causing feces to leak into the abdominal cavity. He said death would have taken days from this injury, and the victim could possibly have survived with proper medical care. Dr. Toolsey said he did not expect to discover chop wounds, and it is sometimes difficult to distinguish chop wounds from gunshot wounds. He said it would be difficult to ascertain that the victim had chop wounds by just looking at the wounds. He said he did not determine that the victim had chop wounds until he pulled the edges of the wounds together.

Dr. Toolsey testified that the bullet trajectories were backwards and upwards. He said that if the victim were on a horse when the bullet wounds were inflicted, the

8

shots would have been fired from the right going upward by someone on the ground. He said that the chop wound to the left leg was inflicted from behind the victim to the left. Dr. Toolsey testified that the victim's blood alcohol content was .10 and that the victim tested positive for Valium.

Dr. Toolsey testified that he did not take photographs of the autopsy. He stated that Dr. Foree's report identified the chop wounds as gunshot wounds. Dr. Toolsey iterated that it is difficult to determine the type of inflicting instrument until one physically pulls the tissue together, which is typically not done until the post-mortem examination. He testified that if the victim's injuries were sustained within ten minutes of each other, death would have occurred within ten minutes, if not sooner. He said that the combination of alcohol and Valium can cause a slower thought process and impaired judgment. He testified that the gunshot wounds were not aligned with the victim turning around to ride away, although the wounds would be consistent with the victim riding away from an attacker if the victim were turned around looking at the attacker.

Danny Blevins testified that the victim worked for him as a carpenter in the late 1980's and that they had been friends since then. Mr. Blevins said that he had asked the victim to tame his horse, No-Bo, for riding and that the victim was on No-Bo when he was killed. Mr. Blevins said he had never known the victim to be violent, although he said the victim drank too much and took drugs. He said that at one point, the victim was addicted to cocaine. He said he knew the victim had been in jail for assaulting the victim's former mother-in-law. Mr. Blevins testified that although the victim had access to his house and buildings, he never noticed anything missing. He testified that the victim was right-handed.

Mr. Blevins testified that he knew the victim had been charged with horse theft but that the victim told him he was innocent. He said he did not know that the victim

9

had been convicted. Mr. Blevins said that for the two months preceding the victim's death, the victim performed carpentry work for a man in Cleveland. He said he did not know the victim had Valium in his system at the time of the incident. He admitted posting bond for Ms. Linder.

Detective Gary Miller of the McMinn County Sheriff's Department testified that he arrested the defendant about one and one-half hours after the incident. He said the defendant was calm and cooperative. He said that when he asked the defendant why he shot the victim, the defendant replied, "Why did they break into my house?" He said the defendant then stated, "I don't care if they give me the electric chair." Detective Miller said the defendant did not appear angry. He testified that he recovered an SKS rifle and ammunition from the defendant's house. He said that when he asked the defendant what items were taken in the burglary, the defendant responded that his "faggot bag" was taken. Detective Miller said that the defendant then stated that he did not want to talk anymore.

Detective Miller testified that he spent three hours at the scene of the altercation, but no one reported that the victim had chop wounds, only gunshot wounds. Detective Miller said that he did not find any blood in the defendant's van. He said that at the time of arrest, the defendant was wearing jeans and a t-shirt. He said that at the victim's home, he saw a handle protruding from beneath a blanket on a bed. He said he did not uncover it and did not obtain a search warrant to look for a sword. He stated that he never located a sword that fit the scabbard found at the scene. He testified that he was primarily involved in the burglary investigation, not the homicide investigation.

Detective Jerry Wilson was recalled. He admitted that he testified earlier that he inspected the horse at the scene and saw a bullet hole through the saddle. He said

that after examining the saddle during his testimony, he could see that the saddle had no bullet hole. He testified that the saddle was bloody when he first examined it.

The defendant testified that he had previously worked with the victim at a construction site. He said the victim told him that he had just been released from jail, and the victim showed him scars from shootings and knifings. He said the victim seemed to be bragging about how mean he was. He said that by the end of the week on the job, the victim had been arrested three times for DUI.

The defendant testified that one year later, he saw the victim and Ms. Linder, and the victim had a vodka bottle. He said the victim got into a fight and dropped a knife on the ground. He said he agreed to take the victim home to prevent the victim from being arrested. The defendant said that after that incident, he occasionally saw the victim riding horses with Ms. Linder, with them often appearing drunk. He said he heard that the victim had been charged with horse theft. The defendant testified that Michael Guffey's sons had helped him on his farm with carpentry work. He denied telling David Guffey that he would kill anyone who stole from him.

The defendant testified that on August 10, he went to Knoxville and returned around 6:00 p.m. to find his home burglarized. He said he noticed horse hoof prints, a beer can and horse droppings around his house. He said the house was completely ransacked and was muddy. He testified that in his father's room, a dresser drawer holding family heirlooms had been pulled out. The defendant stated that he called 9-1-1 around 8:00 p.m. He said he was angry and wanted the police to investigate. He said he told Officer Smith that he did not know exactly what was missing and that he had not touched anything in order for the police to take fingerprints. He said Officer Smith told him he would take a report and turn it over to a detective. The defendant said Officer Smith stated he would watch for anyone on horseback and told the defendant to call

11

him if he had any leads. The defendant testified that he was angry that no investigation was being performed.

The defendant testified that when he determined which items were stolen, he was particularly angry about the missing family heirlooms. He said he was also missing two swords, a bag, a chainsaw, and a scabbard. He said he asked his neighbor, Gene Belk, if he had seen anyone riding horses that day, and Mr. Belk said he had seen the victim and Ms. Linder. The defendant said it was getting dark, and he grabbed his SKS rifle and loaded it with six rounds. He said he wrote a note to his family that said, "Dear family, I think I know who did this. Here's my checkbook, and if I don't come back . . ." He said he suspected that the victim committed the burglary. He said he went to find the victim because he wanted to retrieve his belongings, not to kill the victim. He said he was wearing jeans and a black t-shirt.

The defendant said that he left his house at 11:00 p.m. and took the rifle with him for protection. He said he saw Mr. Guffey on the road and tried to stop him to ask if he had seen anyone on horseback, but Mr. Guffey would not stop. The defendant said Mr. Guffey was driving fast as if he was trying to get away from the defendant. The defendant said Mr. Guffey drove to where David Guffey and the victim were sitting on horseback. The defendant said he left his van and said to the victim, "Hey neighbor, I came to visit you." The defendant said he did not have anything in his hand, and the victim was fifteen feet away. The defendant said the victim had the defendant's sword inside the scabbard, and the defendant said, "You broke in my house too, didn't you." He said he walked closer to the victim and identified his black fanny pack, and the victim said, "Yes." The defendant said he told the victim to get off the horse because he was going to make a citizen's arrest. He said David Guffey got off his horse and ran away. He denied saying anything to David Guffey.

12

The defendant said he approached the victim, who tried to strike him with a bottle. He said he grabbed the horse's head and tried to knock the victim off the horse. He said that during the scuffle, the victim pulled out a sword. The defendant said he grabbed the sword from the victim and struck the victim's left arm. He said the fight then became more aggressive, and the victim came toward him on the horse. He said he struck the victim again on the thigh. The defendant testified that the victim continued to charge toward him, then backed away. The defendant said he thought the fight was over, but the victim then dug into the saddlebag. The defendant said he went to his van and grabbed his rifle. He said he looked up, and the victim was holding a gun in his right hand aimed at him. The defendant said he fired three shots, and the victim fell off the horse. He said the horse remained standing and did not appear to have been struck by any bullets. The defendant said he shot the victim in self-defense.

The defendant testified that he put the sword that he had grabbed from the victim into his van. He said the victim had another of the defendant's swords that was tied to the horse with webbing, but he left it at the scene. The defendant testified that Mr. Guffey drove to an intersection, turned around, and came back to the scene. The defendant said he turned around and followed the Guffeys. He said that the victim was moving on the ground as he drove past him and that the horse was still standing. The defendant said Mr. Guffey turned around, drove toward him and stopped. He said Mr. Guffey asked him, "What's the matter?" The defendant said he told Mr. Guffey, "You all knew he stole from me." The defendant said Mr. Guffey then sped off.

The defendant testified that he thought Mr. Guffey was involved in the burglary. He said he continued driving and found Ms. Linder in the victim's trailer. He said he grabbed her by the shirt and asked her why she broke into his house. He said Ms. Linder denied breaking into his house. The defendant said he then heard sirens, and

13

he went home. He said he did not return to the scene because he was scared. He said he took the rifle and sword inside his house.

The defendant testified that officers arrived at his house about thirty minutes later and he surrendered. He said that the officers read him his Miranda rights and that he told them he wanted to exercise his rights to silence and to counsel. He said Detective Miller told him that would only make it harder on him. He denied telling the detective that he did not care if he got the electric chair. The defendant testified that at the police station, the officers continued to try to persuade him to waive his rights. He said they continued to question him, and he continued to assert his rights.

The defendant testified that he learned about self-defense as a Green Beret. He said he had trained in self-defense and martial arts for fifteen years. He said he never had any previous trouble with the victim. He stated that he did not know about the victim's assault on the victim's former mother-in-law. He said he had ridden horses with the victim and other men one time, and the victim had not given him any trouble. The defendant stated that he did not take any of his martial arts equipment with him for protection on the night of the offense. He said he did not report to the police his suspicion that the victim had committed the burglary. He stated that he did not recover his stolen property from the scene because he was "disillusioned."

The defendant denied causing the victim's chop wounds. He said that his rifle holds only six rounds and that he fired only three shots at the victim, leaving three unspent bullets in the rifle. He acknowledged that the police retrieved four unspent bullets from his rifle, but he did not know where the extra bullet came from. He denied taking the second sword from the scene. He said he did not call 9-1-1 because he was "disillusioned." He said he searched for Ms. Linder because he wanted answers about the burglary. He said he believed that when the Guffeys left the scene, they were going

14

back to his house to steal more items. He said he suspected that the Guffeys were the other burglars, not Ms. Linder. He admitted that he did not try to effect a citizen's arrest on the Guffeys.

Ersie Walker testified that she is the victim's former mother-in-law. She testified that on July 19, 1995, she picked up her granddaughter, who said that the victim had hit her on the arm. Ms. Walker said she told him the victim to move out. She said the victim had been drinking, and he followed her home. She said the victim approached her as she was standing beside her car. She said the victim saw a baseball bat in the car and tried to get it. She said a struggle ensued as she tried to stop him, and the victim pulled out a knife and stabbed her three times, puncturing her lung. She said she then pulled out a gun that was not in working condition and hit the victim in the head. She said the victim was convicted of assault.

Jimmy Simpson testified that the victim came to his house one day and said he had pawned a gun to Simpson's son and wanted the gun back. Mr. Simpson said the victim stated that if he did not get the gun back, he would return and kill all of them. Mr. Simpson said the victim called his house later that night and threatened to come and kill everyone. Mr. Simpson said he watched for the victim outside, and the victim came by and fired shots. Mr. Simpson admitted that he had a felony drug conviction.

Gene Belk testified that he was the defendant's neighbor. He testified that on August 10, the defendant came to his house around 9:00 or 9:30 p.m. and asked him if he had seen anyone on horseback. He said he told the defendant that he had seen the victim and Ms. Linder. Mr. Belk said the defendant then told him he had to go meet with law enforcement.

15

Detective Jerry Wilson was recalled. He loaded the rifle retrieved from the defendant's home and demonstrated that the rifle held twelve rounds. The defendant was recalled and testified that he did not know the weapon would hold twelve rounds. He testified that he had never loaded more than six rounds and that the gun normally jams when one puts more than six rounds in it. Upon the foregoing proof, the jury convicted the defendant of second degree murder.

## I. SUFFICIENCY OF THE EVIDENCE

The defendant contends that the evidence is insufficient to support his conviction for second degree murder. He argues that the state failed to prove that the injuries he inflicted on the victim caused the victim's death, and he argues that the evidence, at most, supports a conviction for voluntary manslaughter. The state contends that the evidence is sufficient.

Our standard of review when the sufficiency of the evidence is questioned on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979). This means that we do not reweigh the evidence but presume that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the state. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978).

## A. Causation

The defendant contends that the state failed to prove that the injuries he inflicted on the victim caused the victim's death. First, he argues that Doctors Foree and Toolsey may have examined different bodies. Next, he argues that no proof exists to show that the injuries he inflicted caused the victim's death. He argues that the

16

evidence shows that only three shots were fired from his rifle but that there were four gunshot wounds, that the state failed to prove that these three shots killed or even struck the victim, and that the chop wounds were not fatal.

We believe the evidence sufficiently supports the defendant's conviction. First, the defendant's argument that Doctors Foree and Toolsey may have examined two different bodies is not supported by the record. The defendant correctly asserts that Dr. Foree's initial report and Dr. Toolsey's autopsy report are somewhat inconsistent regarding the types of injuries. However, Dr. Toolsey explained at trial that it is difficult to determine the type of inflicting instrument until one physically pulls the tissue together, which is typically not done until the post-mortem examination. The defendant argues that Dr. Toolsey could not identify the body upon which he performed the autopsy as being that of Terry Bohannon. However, Dr. Toolsey was able to identify and discuss photographs of the victim's injuries, not made during the autopsy, as being those of the person upon whom he performed the autopsy.

The defendant also contends that no evidence exists to show that the injuries he inflicted upon the victim caused the victim's death. He argues that the evidence shows that he fired only three shots and that no evidence exists to show that the three shots struck or killed the victim. He further argues that Dr. Toolsey testified that the chop wounds would not have caused the victim's death.

We disagree with the defendant's interpretation of the trial record. The prosecutor asked Dr. Toolsey which of the victim's wounds was sufficient to cause death. Dr. Toolsey responded, "Well, I think probably the better question would be to ask which one would not. With the exception of probably one, each of them would have proved eventually to be fatal." Dr. Toolsey testified that the only injury that would not have been fatal was the gunshot wound to the right leg. The evidence shows that the

17

defendant fired at least three shots at the victim. The shots obviously hit the victim because the defendant's own testimony was that the victim toppled off the horse after the shots were fired.

With respect to the chop injuries, Dr. Toolsey testified that they were "very significant and deep wounds, chopping their way almost all the way through to the bone . . . . And it is possible to bleed to death from any one of these." Although Dr. Toolsey testified that sometimes clean chop wounds that completely sever an artery are less lethal or less dangerous, he never testified, as the defendant states in his brief, that the victim's chop wounds would not have caused his death. The evidence shows that the defendant shot and chopped the victim. All but one of the victim's wounds were lethal. The defendant's argument to the contrary is not supported by the record.

## B. Provocation

The defendant contends that the evidence is insufficient to support a finding that he knowingly killed the victim. He argues that the killing was, at most, voluntary manslaughter because he was provoked by the victim's burglary of his home and by the victim's attack upon him when he went to retrieve his property. We hold that the evidence is sufficient to support the second degree murder conviction.

Second degree murder is defined as a knowing killing of another. Tenn. Code Ann. § 39-13-210. Tenn. Code Ann. § 39-11-302(b) provides that:

> "Knowing" refers to a person who acts knowingly with respect
> to the conduct or to circumstances surrounding the conduct
> when the person is aware of the nature of the conduct or that
> the circumstances exist. A person acts knowingly with respect
> to a result of the person's conduct when the person is aware
> that the conduct is reasonably certain to cause the result.

18

In the light most favorable to the state, the evidence shows that the victim returned to his home around 6:00 p.m. to find that it had been burglarized. Testimony from the defendant's neighbor, Gene Belk, suggests that the defendant suspected the victim before he called the police. However, the defendant told Officer Smith that he did not have any suspects. Several hours after learning of the burglary, the defendant armed himself with a loaded SKS rifle and set out in search of the victim. When he found the victim, he told David Guffey, "Get off your horse; you don't need to see this." The defendant then confronted the victim about the missing items and attacked the victim, shooting and chopping him such that the victim bled to death. No evidence exists, other than the defendant's testimony, that the victim was armed or that the victim initiated the attack. No weapons were found in the vicinity of the victim. The jury obviously chose to discredit the defendant's testimony, as is their prerogative, rejecting his theory that he was lawfully trying to recover his property when he was attacked by the victim. Although the defendant claims that he searched for the victim only to recover his property, he admitted that he did not retrieve the property after incapacitating the victim.

The defendant cites several cases in support of his argument that he acted upon adequate provocation. See State v. Thornton, 730 S.W.2d 309 (Tenn. 1987); Smith v. State, 370 S.W.2d 543 (Tenn. 1963); Cooper v. State, 356 S.W.2d 405 (Tenn. 1962); Wright v. State, 497 S.W.2d 588 (Tenn. Crim. App. 1973). Cooper, Smith and Wright are factually distinguishable because they concern situations in which the victim was the original aggressor or an intruder. Thornton is also dissimilar to the present case. In Thornton, the defendant shot the victim, his wife's lover, when he discovered the two in the midst of sexual intercourse. Our supreme court stated that "the commission of unlawful sexual intercourse . . . is an act obviously calculated to arouse ungovernable passion," and held that the killing of the adulterer under such circumstances in the heat of passion is voluntary manslaughter. The present case, however, concerns no such

circumstances, and no credible evidence exists to suggest that the victim was the original aggressor.  In sum, the evidence supports a conviction for second degree murder.

## II.  LIMITATION OF CROSS-EXAMINATION

The defendant contends that the trial court erred by not allowing him to cross-examine Dr. Toolsey as to his knowledge of the identity of the body upon which Dr. Toolsey performed his autopsy.  He argues that the discrepancies between Dr. Toolsey's autopsy report and Dr. Foree's initial report show that the two may have been examining different bodies and that he should have been allowed to explore the issue on cross-examination of Dr. Toolsey.  The state contends that the trial court properly limited the cross-examination.

The Sixth Amendment provides that the accused shall have the right "to be confronted with the witnesses against him."  U.S. Cont. amend. VI.  The right of confrontation includes not only the right to confront the witness at trial but also the "'opportunity for effective cross-examination.'" State v. Howell, 868 S.W.2d 238, 252 (Tenn. 1993) (quoting Delaware v. Fensterer, 474 U.S. 15, 20, 106 S. Ct. 292, 294 (1985)).  However, "a defendant's right to confrontation does not preclude a trial court from imposing limits upon cross-examination which take into account such factors as harassment, prejudice, issue confusion, witness safety, or merely repetitive or marginally relevant interrogation." State v. Reid, 882 S.W.2d 423, 430 (Tenn. Crim. App. 1994).  "Appellate courts may not disturb limits on cross-examination except when there has been an unreasonable restriction on the right." State v. Fowler, 213 Tenn. 239, 253, 373 S.W.2d 460, 466 (1963).

In the present case, the defendant sought to cross-examine Dr. Toolsey on the identity of the body upon which he performed the autopsy. The following colloquy occurred:

>ATTORNEY: First of all, how do you know that this was Terry Bohannon?
>
>DR. TOOLSEY: How do I know? I don't.
>
>ATTORNEY: Did you know Terry Bohannon before this date?
>
>DR. TOOLSEY: No, I don't.
>
>ATTORNEY: You don't know whether or not this was Terry Bohannon?
>
>DR. TOOLSEY: I know that there was a deceased-

The state then objected, stating that it would identify a picture of the deceased if identity was an issue. In a jury-out hearing, Dr. Toolsey referred to photographs of the victim and stated, "Now the face, I don't remember, but I did document that he had this tattoo and it's in my autopsy protocol. This is a distinguishing mark and it is mentioned in my protocol." After argument, the trial court ruled that the defendant's attorney could question Dr. Toolsey about discrepancies between his findings and Dr. Foree's report but that the attorney could not question Dr. Toolsey about the identity of the body.

We believe that the trial court erred by limiting the defendant's cross-examination of Dr. Toolsey. Considering that Dr. Toolsey made no photographs during his autopsy, no one from the sheriff's department was present during the autopsy, and discrepancies between the doctors' reports existed, the defendant was entitled to cross-examine Dr. Toolsey on the identity of the body he examined. Having concluded that the trial court erred, we must now determine whether it is reversible error. In State v. Howell, 868 S.W.2d 238, 253 (Tenn. 1993), our supreme court stated as follows:

>In determining whether the constitutionally improper denial of a defendant's opportunity to impeach a witness is harmless under the [Chapman v. California, 386 U.S. 18, 87 S. Ct. 824 (1967)] standard, the correct inquiry is whether, assuming that the damaging potential of the cross-examination were fully

21

realized, the error was nonetheless harmless beyond a reasonable doubt. [Delaware v. Van Arsdall, 475 U.S. 673, 684-85, 106 S. Ct. 1431, 1438 (1986)]. A number of factors are relevant to this inquiry including the importance of the witness' testimony in the prosecution's case, the cumulative nature of the testimony, the presence or absence of evidence corroborating or contradicting the witness on material points, the extent of cross-examination otherwise permitted, and the overall strength of the prosecution's case. Id.

We hold that the error is harmless beyond a reasonable doubt. Our supreme court's directive in Howell is to consider the question of harm assuming that the damaging potential of the cross-examination were fully realized. In the present case, the damaging potential was realized. Dr. Toolsey admitted that he could not identify the body as that of Terry Bohannon. The defendant does not articulate what more he hoped to achieve from further cross-examination, other than his argument that the discrepancies between the two reports show that the doctors may have been examining two different bodies. However, the trial court ruled that the defendant was free to explore these discrepancies on cross-examination of Dr. Toolsey. Thus, the defendant was allowed to and did question Dr. Toolsey on the fact that Dr. Foree did not note any chop marks and noted different injuries than those found by Dr. Toolsey. In light of Dr. Toolsey's admission that he did not know whether the body he autopsied was that of Terry Bohannon and the trial court's ruling that the defendant could explore the discrepancies between the two reports, we cannot say that the trial court's erroneous limitation of cross-examination more probably than not affected the judgment.

### III. PROSECUTORIAL MISCONDUCT

The defendant contends that the district attorney committed prosecutorial misconduct during cross-examination and closing argument by repeatedly referring to the defendant's exercise of his constitutional right to silence upon arrest. He argues that the prosecutor's repeated comments violated his right to a fair trial. The state contends that the defendant never asserted his right to silence, rather the defendant

22

made a statement upon arrest that was contradictory to his trial testimony, and the prosecutor was entitled to question the defendant about the contradictions.

Due Process generally prohibits the prosecution from questioning a defendant regarding his post-arrest silence. Doyle v. Ohio, 416 U.S. 610, 618, 96 S. Ct. 2240, 2245 (1976). The obvious reason is that a defendant should not be told that he has a right to remain silent that cannot be held against him only to have that very thing happen should he decide to testify at trial. The United States Supreme Court has held that it is "impermissible to penalize an individual for exercising his Fifth Amendment privilege when he is under police custodial interrogation. The prosecution may not, therefore, use at trial the fact that [a defendant] stood mute or claimed his privilege in the face of accusation." Miranda v. Arizona, 384 U.S. 436, 468, 86 S. Ct. 1602, 1625 (1966). However, a defendant cannot use his post-arrest silence to shield himself from the effect of patently inconsistent testimony at trial. Thus, a defendant who elects to testify may be subject to the impeaching effect of proof of any prior inconsistent statement. Braden v. State, 534 S.W.2d 657, 660 (Tenn. 1976).

The evidence shows that Detective Gary Miller testified that upon arrest and after Miranda warnings, the defendant stated that he did not care if he got the electric chair and that the defendant told him the location of the rifle. Detective Miller also testified that when he asked the defendant why he shot the victim, the defendant replied, "Why did they break into my house?" The defendant elected to testify at trial, and during direct examination, he denied making the statements attributed to him by Detective Miller. The defendant testified extensively about his invocation of his right to remain silent, stating that although the officers continued to try to persuade him to waive his rights, he continued to invoke them.

23

The defendant takes issue with four instances in which the prosecutor commented on the defendant's invocation of his right to silence. Two of the comments occurred during cross-examination of the defendant, and two occurred during closing argument. First, the defendant challenges the prosecutor's question during cross-examination, "When was it, the first time, Mr. Wilcox, that you told the version of the events of August 10th? When's the first time that you told that as you've told it here today to this jury?" Later during cross-examination, the prosecutor asked the defendant why he did not try to make a citizen's arrest of Mr. Guffey, to which the defendant responded that he heard sirens and thought it best to go home. The prosecutor then stated, "And seize on your, your rights as you did."

During closing argument, the prosecutor stated as follows:

> And now, you know, Mr. Bohannon (sic) seemed to know quite a little bit about his legal rights and that's. . . something he should be commended for. He knew what they were and he knew how to exercise them and that's great. I don't have, I can't criticize him, wouldn't criticize that. We all ought to. He's very concerned about things like due process, things like trials like this.

Later, the prosecutor stated, "That's the entirety of the evidence that brought us here to this case, with this man so conscious of the rights of due process of himself and others."

We do not believe that the circumstances of this case are of the type contemplated in Doyle and subsequent Tennessee cases. See Braden, 534 S.W.2d at 660; Ware v. State, 565 S.W.2d 906, 908 (Tenn. Crim. App. 1978); Honeycutt v. State, 544 S.W.2d 912, 918 (Tenn. Crim. App. 1976); Parks v. State, 543 S.W.2d 855, 857 (Tenn. Crim. App. 1976); The defendant correctly argues that the state is prohibited from commenting at trial on a defendant's silence upon arrest. The rationale is that it is unfair to provide the defendant with a right to silence, then use the defendant's invocation of that right at trial to infer guilt. In the present case, however, the state did

24

not introduce the defendant's invocation of his right in order for the jury to infer guilt. In fact, the defendant himself testified extensively on direct examination about how he asserted his right to silence.

An analysis of the prosecutor's questioning and argument shows that the comments were not calculated to permit an inference of guilt from the defendant's silence. In context, the prosecutor's cross-examination questioned the defendant's veracity and credibility in light of Detective Miller's testimony that the defendant did not exercise his right to silence but made a statement. In this respect, we believe that a defendant who voluntarily testifies that he invoked his right to silence can be cross-examined regarding contradictory proof adduced at trial that the defendant made a statement. See, e.g., Braden, 534 S.W.2d at 660. In addition, the second two comments are not calculated to permit an inference of guilt but rather to show the irony in the defendant's testimony that he was concerned about rights, when he obviously had no concern for the victim's rights. We do not view the prosecutor's comments to be prejudicially improper.

## IV. COMMENT DURING CLOSING ARGUMENT

The defendant contends that the trial court erred by allowing the prosecutor to state during closing argument that the sheriff's department was working on a shoestring budget. He argues that the statement was offered to rebut the defendant's claim of sloppy investigation by the sheriff's department but that no evidence exists in the record to support the prosecutor's claim. The state contends that the prosecutor's statement was a proper summary of the evidence.

The Tennessee Supreme Court has recognized that "argument of counsel is a valuable privilege that should not be unduly restricted." Smith v. State, 527 S.W.2d 737, 739 (Tenn. 1975). However, closing argument must be "temperate, must be

25

predicated on evidence introduced during the trial of the case and must be pertinent to the issues being tried." Russell v. State, 532 S.W.2d 268, 271 (Tenn. 1976). Improper statements made during closing argument constitute reversible error if the statements affected the verdict." State v. Sutton, 562 S.W.2d 820, 823 (Tenn. 1978).

In the present case, the prosecutor stated the following:

> Okay. So we didn't send some things off for chemical analysis. What we try to do with your tax money is preserve those services for cases where it's needed. Look at the anatomy of this case . . . . They get a burglary report that we're going to talk about here in a few minutes from Mr. Wilcox. Within a few hours- we're not talking days and we're not talking Monday through Friday. We're talking Sunday, you know. I mean even Detective Wilson ought to have a little time on Sunday. He's on call but he doesn't sit at his desk on Sunday night at eight o'clock to just wait for Mr. Wilcox to come in and report this burglary. You've got a couple of deputies out there on a stringshoe (sic) budget servicing the entire county-

The state argues that the prosecutor's statement was a proper summary of the evidence. Specifically, it points to testimony from trial that (1) the investigating officer was not trained to lift fingerprints; (2) no detective was on duty at the time of the burglary; (3) the entire county has only three detectives, one is on call on the weekends, and none actually work on the weekends; and (4) the McMinn County Medical Examiner is not a pathologist and does not conduct post-mortem examinations. We question whether the previous testimony allows for a reasonable argument that the county was on a shoestring budget. Nevertheless, we believe that the defendant has failed to demonstrate that the statement affected the verdict. The comment was isolated and innocuous, the evidence against the defendant is great, and no evidence exists regarding the prosecutor's improper intent. See Judge v. State, 539 S.W.2d 340, 344 (Tenn. Crim. App. 1976).

In consideration of the foregoing and the record as a whole, we affirm the judgment of conviction.

_____
Joseph M. Tipton, Judge


CONCUR:

_____
John Everett Williams, Judge

_____
Alan E. Glenn, Judge